CHRISTOPHER E. BABBITT (SBN 225813)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail: christopher.babbitt@wilmerhale.com

JOHN A. MAIER (SBN 191416)
MAIER PFEFFER KIM GEARY & COHEN LLP
1440 Broadway, Suite 812
Oakland, CA  94612
Telephone:  (510) 835-3020
Facsimile:  (510) 835-3040
E-mail: jmaier@jmandmplaw.com

Attorneys for Plaintiff
THE ESTOM YUMEKA MAIDU TRIBE OF THE
ENTERPRISE RANCHERIA, CALIFORNIA

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTOM YUMEKA MAIDU TRIBE OF THE ENTERPRISE RANCHERIA, CALIFORNIA, | Case No. _____ |
| Plaintiff, | |
| v. | |
| STATE OF CALIFORNIA, | **COMPLAINT** |
| Defendant. | |

COMPLAINT

Plaintiff THE ESTOM YUMEKA MAIDU TRIBE OF THE ENTERPRISE

RANCHERIA, CALIFORNIA alleges as follows:

**INTRODUCTION**

1.      This is an action brought under the Indian Gaming Regulatory Act ("IGRA"), 25

U.S.C. § 2710(d)(7)(A)(i), to compel Defendant the State of California (the "State" or

"California") to comply with IGRA's requirement that it negotiate in good faith with Plaintiff

Estom Yumeka Maidu Tribe of the Enterprise Rancheria ("the Tribe") for the purpose of

entering into a tribal-state gaming compact pursuant to IGRA.

2.      Plaintiff is a federally recognized Indian tribe, listed in the Federal Register as

the Enterprise Rancheria of Maidu Indians of California, that has lived in and around what is

today known as Butte and Yuba Counties, California from time immemorial.  Lacking usable

tribal land for economic development, the Tribe sought to have 40 acres of land located within

a voter-approved sports and entertainment zone in an unincorporated portion of Yuba County

taken into trust on its behalf pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C.

§ 465, as amended by the Indian Land Consolidation Act of 1983, 25 U.S.C. § 2202.  The

federal government took the 40-acre parcel of land into trust on the Tribe's behalf on May 15,

2013, and the Tribe now exercises jurisdiction over that land.

3.       Pursuant to IGRA, the Tribe has proposed to develop a gaming facility and

hotel on its trust land in order to promote tribal self-determination and economic self-

sufficiency.  *See* 25 U.S.C. § 2702(1) (providing a "a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development, self-

sufficiency, and strong tribal governments.").  Accordingly, the Tribe has sought to enter into a

gaming compact with California pursuant to IGRA, which requires the State to "negotiate with

the Indian tribe in good faith to enter into such a compact."  *Id.* § 2710(d)(3)(A).

4.     The California Constitution prescribes the distinct but related roles that the State's Governor and Legislature play under IGRA in negotiating and entering into a gaming compact with an Indian tribe.  Specifically, Article IV, Section 19(f) of the Constitution provides:  "[T]he Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law."

5.     The State has failed to negotiate with the Tribe in good faith to enter into a gaming compact, as IGRA requires.  Although the Tribe and the State's Governor negotiated and concluded a gaming compact on August 30, 2012, the State's Legislature has neither ratified that compact nor conveyed any proposed new terms or modifications to the compact.  To the contrary, the Legislature has refused to take any action at all on the compact for nearly two years, and the July 1, 2014, deadline negotiated by the parties for the compact to take effect has expired.

6.     The Tribe accordingly brings this action under IGRA's dispute resolution provision, 25 U.S.C. § 2710(d)(7).  The Tribe seeks a declaration that the State has failed to negotiate with the Tribe, and/or has not negotiated in good faith, as required by IGRA.  The Tribe further seeks an order requiring the State to conclude a gaming compact with the Tribe within 60 days, pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), failing which a compact will be selected by a mediator pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv), and providing that if the State fails to consent to the compact selected by the mediator within 60 days, the Secretary of the Interior shall prescribe, in consultation with the Tribe, the procedures under which the Tribe may conduct gaming on the Tribe's Indian lands, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii).

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

9. The Estom Yumeka Maidu Tribe of the Enterprise Rancheria is a federally recognized Indian tribe listed in the Federal Register as the Enterprise Rancheria of Maidu Indians of California. The Tribe exercises jurisdiction over trust lands located in an unincorporated portion of Yuba County, California.

10. The defendant is the State of California. The Honorable Edmund G. Brown, Jr., is now and has been the Governor of the State since January 2011. The State has waived its sovereign immunity and consented to being sued in the courts of the United States "by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a … Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith." Cal. Gov. Code § 98005.

**THE INDIAN GAMING REGULATORY ACT**

**A.    Tribal-State Gaming Compacts**

11. In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Supreme Court held that states have no inherent authority to regulate gaming on Indian lands. *See id.* at 207, 222. In response, Congress enacted IGRA to provide a legal framework for Indian tribes to engage in gaming. IGRA's aim is to facilitate "the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).

12. "Congress enacted IGRA to provide a legal framework within which tribes could engage in gaming—an enterprise that holds out the hope of providing tribes with economic

prosperity that has so long eluded their grasp—while setting boundaries to restrain aggression by powerful states." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1027 (9th Cir. 2010).   IGRA contemplates that a tribe seeking to conduct class III gaming (sometimes called "casino-style" gaming) will typically do so pursuant to a compact with its home state.  *See id.*

13.     IGRA provides that class III gaming activities on Indian lands are lawful if, among other things, such activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity."  25 U.S.C. § 2710(d)(1)(B).  California law permits class III gaming.  *See* Cal. Const. art. IV, § 19(f) ("[T]he Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.").

14.     IGRA further provides that  "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity … is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities."  25 U.S.C. § 2710(d)(3)(A). And IGRA requires that "[u]pon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  *Id.*

15.     IGRA governs and constrains the terms of permissible negotiations between states and tribes, setting forth and limiting the provisions that may be included in any compact. 25 U.S.C. § 2710(d)(3)(C).

16.     Congress intended that "the compact requirement for class III [gaming] not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes." *Rincon Band*, 602 F.3d at 1035.   States may not exclude a tribe from gaming on the basis that another tribe is already permitted to operate a casino because IGRA "was not designed to give states complete power over tribal gaming such that each state can put the opportunity to operate casinos up for sale to the tribe willing to pay the highest price." *Id.* (citing 25 U.S.C. § 2702).   A state also may not take a "hard line" position in negotiations, making a "take it or leave it offer" to the tribe that would require the tribe either to accept provisions "outside the permissible scope" of IGRA or to go without a compact.  *Id.* at 1039.

17.     If a state fails to comply with its obligation to negotiate in good faith with a tribe to enter into a tribal-state gaming compact, IGRA provides a remedy.  Specifically, IGRA permits a tribe to bring suit against a state "arising from the failure of [the] State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact … or to conduct such negotiations in good faith." 25 U.S.C. § 2710(d)(7)(A)(ii).  Such a suit may be brought 180 days after the tribe has requested that the State negotiate with it over a compact. *Id.* § 2710(d)(7)(B)(i).

18.     In such a suit, "upon the introduction of evidence by an Indian tribe" that "a Tribal-State compact has not been entered into" and "the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith," "the burden of proof shall be on the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii).

COMPLAINT                                    - 5 -

19.     IGRA further provides that if, in such a suit, "the court finds that the State has failed to negotiate in good faith …, the court shall order the State and the Indian Tribe to conclude such a compact within a 60-day period." 25 U.S.C. § 2710(d)(7)(B)(iii).  If the State and tribe fail to conclude a compact within that period, the court appoints a mediator, who chooses between compacts submitted by the state and the tribe; the state has 60 days to consent to the compact chosen by the mediator. *Id.* § 2710(d)(7)(B)(vi).  If the state still does not consent, the Secretary of the Interior shall prescribe, in consultation with the tribe, procedures under which class III gaming may occur in the absence of a compact. *Id.* § 2710(d)(7)(B)(vii).

20.     The purpose of these provisions of IGRA is to ensure that tribes have an expeditious means of obtaining either a tribal-state gaming compact or Secretarial procedures that will permit them to operate class III gaming on their Indian lands. *See Mashantucket Pequot Tribe v. State of Connecticut*, 913 F.2d 1024, 1033 (2d Cir. 1990).

21.     It is well-established that the duty to negotiate in good faith requires that, where the person or entity negotiating an agreement is not the same as the person with the power to ratify the agreement, the person with the power to ratify the agreement must convey any objections or demands to the negotiators so that meaningful bargaining can proceed.  A refusal to do so violates the duty of good-faith bargaining. *E.g., Stroehmann Bakeries, Inc. v. NLRB*, 95 F.3d 218, 222 (2d Cir. 1996); *NLRB v. Alterman Trans. Lines, Inc.*, 587 F.2d 212, 221 (5th Cir. 1979).  Similarly, the failure to ratify a negotiated agreement violates the duty of good-faith bargaining. *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 523 (1941).  In short, an entity cannot negotiate an agreement but then refuse to ratify it without violating the duty to negotiate in good faith. *Id.*

**B.      Taking Land Into Trust For Indian Tribes**

22.      IGRA authorizes class III gaming only "on Indian lands."  25 U.S.C.

§ 2710(d)(1).  The statute defines "Indian lands" as "all lands within the limits of any Indian

reservation" and "any lands title to which is either held in trust by the United States for the

benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to

restriction by the United States and over which an Indian tribe exercises governmental power."

*Id.* § 2703(4).

23.      IGRA provides that class III gaming "shall not be conducted on lands acquired

by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," the effective

date of IGRA.  25 U.S.C. § 2719(a).  But Congress created several exceptions to the general bar

on gaming on such "after-acquired" lands.  *See id.* § 2719(b).  One such exception permits

tribes to conduct gaming on after-acquired lands when:  (i) the Secretary of the Interior

"determines that a gaming establishment on newly acquired lands would be in the best interest

of the Indian tribe and its members, and would not be detrimental to the surrounding

community," and (ii) the "Governor of the State in which the gaming activity is to be conducted

concurs in the Secretary's determination."  *Id.* § 2719(b)(1)(A).

24.      The Indian Reorganization Act authorizes the Secretary of the Interior to acquire

land and to hold it in trust "for the purpose of providing land for Indians."  25 U.S.C. § 465.

The procedures for trust acquisitions are set out in 25 C.F.R. part 151.  These procedures

require the Secretary to consider, among other factors, the need of the tribe for additional land,

the purposes for which the land will be used, the location of the land relative to the tribe's

original reservation, and the economic benefits associated with the proposed use of the land.  25

C.F.R. §§ 151.10-151.11.

COMPLAINT                                          - 7 -

## FACTUAL BACKGROUND

**A.      The Tribe**

25.      The Estom Yumeka Maidu Tribe of the Enterprise Rancheria was federally recognized as a sovereign Indian tribe on April 20, 1915.  Secretary of the Interior, Letter Regarding Two-Part Determination, Sept. 1, 2011, at 15 (a copy of which is attached as Ex. A).

26.      In the mid-1800s, non-Indian settlers began to displace California's Indians from their ancestral lands.  The United States eventually purchased two 40-acre parcels of land for the Enterprise Indians near the former town of Enterprise in 1915 and 1916, in order to protect the Tribe and preserve some of its traditional lands.  These parcels became known as Enterprise 1 and Enterprise 2.

27.      Enterprise 1 was, at the time of its purchase by the United States, occupied by a family of persons of Estom Yumeka Maidu descent.  Enterprise 1 today is located on a hillside above Lake Oroville, a reservoir north of Yuba City, California.  It sits in a remote and sparsely populated area accessible only by dirt road.  A substantial portion of Enterprise 1 is unsuitable for building due to the steepness of the terrain and the significant cultural resources located on the parcel.

28.      Enterprise 2, the other parcel purchased for the Tribe, once was home for a number of current members of the Tribe, and other tribal members descend from former residents of Enterprise 2.  However, in 1964, Congress enacted Public Law 88-453, which permitted the Department of the Interior to transfer Enterprise 2 to the State of California, which planned to submerge Enterprise 2 under Lake Oroville, a reservoir created by the construction of the Oroville Dam.  This transaction was completed in 1965, and today Enterprise 2 lies at the bottom of Lake Oroville.  The Tribe's members were not awarded

replacement land.  They lost their homes, community, and land base, and were forced to scatter throughout the Sacramento Valley.

29.     In 1995, the Bureau of Indian Affairs recognized the Tribal Council and General Council of the Estom Yumeka Maidu Tribe of the Enterprise Rancheria as the duly constituted governing body of the Tribe with jurisdiction over its members and tribal lands.

30.     The Tribe has nearly 900 individual members.  The Tribe's average household income is very low; over 40 percent of the Tribe's labor force is unemployed or employed but earning less than $9,048 per year.  The Tribe's members currently rely heavily on federal and state benefits programs.

**B.     The Yuba Parcel and the Two-Part Determination**

31.     In 2002, the Tribe acquired rights to purchase approximately 40 acres of land in unincorporated Yuba County, California ("the Yuba parcel") for the purpose of developing a gaming resort to promote tribal self-determination and economic self-sufficiency.  *See* 25 U.S.C. § 2702(1).

32.     In 2002, the Tribe submitted a fee-to-trust application to the Department of the Interior, seeking to have the Yuba parcel taken into trust for its benefit to facilitate tribal self-determination and economic development as set forth under 25 C.F.R. § 151.3.  In 2006, the Tribe supplemented its trust application with a written request for a so-called "two-part determination" by the Secretary of the Interior.  The request asked the Secretary to determine that the Yuba parcel, once in trust for the Tribe, would be eligible for gaming under 25 U.S.C. § 2719(b)(1)(A).

33.     The Tribe's trust application and request for a two-part determination were subject to a lengthy environmental review process.   In August 2010, the Department of the Interior published notice of the final environmental impact statement for the proposed trust

acquisition and gaming project.  *See* 75 Fed. Reg. 47,618 (Aug. 6, 2010).  Processing of the application and two-part request were also delayed by the Indian gaming policy reviews of two federal administrations and the issuance of new regulations for newly acquired trust lands under 25 C.F.R. part 292.

34.     Finally, on September 1, 2011, the Secretary of the Interior issued a favorable determination under 25 U.S.C. § 2719(b)(1)(A), determining that a gaming establishment on newly acquired lands would be in the best interest of the Tribe and its members and would not be detrimental to the surrounding community.   Pursuant to IGRA, the Secretary requested that the Governor of California concur in his determination, which the Governor did by letter dated August 30, 2012.

35.     On November 21, 2012, the Secretary made a final agency determination to acquire the Yuba parcel in trust for gaming purposes for the Tribe.  *See* 77 Fed. Reg. 71,612 (Dec. 3, 2012).  The Secretary published notice of his final determination on December 3, 2012. *Id.*  On January 2, 2013, the Bureau of Indian Affairs issued a corrected description of the Yuba parcel.  78 Fed. Reg. 114-01 (Jan. 2, 2013).

36.     The Department of the Interior took the Yuba parcel into trust on behalf of the Tribe on May 15, 2013.  (A copy of the Bureau of Indian Affairs' Acceptance of Conveyance is attached as Ex. B).

37.     The Yuba parcel and the proposed gaming and hotel project would allow the Tribe to generate jobs and educational opportunities for its citizens.  The project also promises to generate the revenues required for the Tribe to significantly expand its governmental services, including those focused on improving the health, education, and welfare of the Tribe. Secretary of the Interior, Letter Regarding Two-Part Determination, Sept. 1, 2011, at 9 (a copy of which is attached as Ex. A).

38.     In his September 1, 2011 letter to the Governor of California regarding his two-part determination under IGRA, the Secretary concluded that the proposed gaming facility would provide numerous benefits for the Tribe:

A.    "The Tribe's proposed gaming facility would provide significant opportunities for unemployed and underemployed tribal citizens to obtain jobs, either through direct employment at the Resort, or indirect employment in tribal programs funded with gaming revenues."  Secretary of the Interior, Letter Regarding Two-Part Determination, Sept. 1, 2011, at 9 (a copy of which is attached as Ex. A).

B.    "Construction-related activities associated with the Resort are projected to generate 1,300 temporary jobs and nearly $35,000,000 in annual wages. The Resort is expected to generate 1,933 permanent operational jobs and nearly $32,000,000 in wages. The Tribe is committed to increasing tribal employment by offering jobs at the Resort to tribal citizens and establishing a preference for hiring tribal citizens."  *Id.* (citation omitted).

C.    "The Tribe intends to provide job training and career development services to all employees of the Resort, including those who are not tribal citizens.  The Tribe is committed to offering training programs to assist both Yuba County residents and tribal citizens, in becoming qualified for employment."  *Id.*

D.    "The Tribe intends to use the revenue derived from the Resort to significantly expand its governmental services, including those focused on improving the health, education, and welfare of the Tribe.  The expansion of the Tribe's governmental services will, in turn, create new, professional job opportunities for tribal citizens seeking employment in the tribal government."  *Id.*

E.   "Revenues from the Resort also will enable the Tribe to provide educational and training opportunities to its tribal citizens, broadening employment and career prospects for its citizens to pursue employment opportunities that are not affiliated with the Resort or tribal governmental services." *Id.* at 10.

F.   "Tribal income will allow the Tribe to provide a variety of much needed social, housing, governmental, administrative, educational, health and welfare services to its citizens.  This new income will expand and improve existing tribal governmental operations by funding additional staff and upgrading equipment and facilities.  In turn, this will lead to increased professional employment opportunities for tribal citizens and incentivize the pursuit of higher education." *Id.*

G.   "The tribal income also will provide capital for other non-gaming economic development and investment opportunities, including investments in businesses owned by tribal citizens, allowing the Tribe to diversify its holdings over time.  Overall, this development will improve the quality of life of tribal citizens and strengthen the viability of the Tribe's government and economy." *Id.*

39.   In its September 1, 2011 letter to the Governor of California regarding its two-part determination under IGRA, the Secretary also concluded that the proposed gaming facility would provide benefits for local governments and Yuba County generally:

A.   "The [Environmental Impact Statement] projects that the establishment of the Resort at the Site will lead to an increase in the number of visitors to Yuba County.  Increased tourism in Yuba County will have both direct and indirect benefits to the Tribe … More specifically, the development of the Resort in the area will stimulate existing local tourism and provide incentives to visit Yuba County, thereby benefitting the local economy as a whole.  This influx of non-resident consumers will

benefit businesses owned by tribal citizens, businesses employing tribal citizens, and will create new employment opportunities for tribal citizens." *Id.*

B.   "The anticipated job creation and economic growth resulting from the Resort will provide a much needed boost to the local economy in Yuba County and surrounding communities …. [T]he unemployment rate in Yuba County is somewhat higher than that in the rest of California.  By January 2009, the unemployment rate for Yuba County was 17.9 percent, compared to 10.1 percent for California and 7.6 percent nationally." *Id.* at 11.

## C.      Negotiating a Gaming Compact

40.      The Tribe sent the State a request to begin compact negotiations on June 1, 2000.  (A copy of this request is attached as Ex. C.)  It sent an additional request on January 16, 2004, noting that it intended to develop a resort hotel and casino on the 40-acre Yuba parcel.  (A copy of this request is attached as Ex. D.)   The State initially rejected these requests for negotiations.  Over the next several years, however, the Tribe continued to meet do discuss the benefits of its proposed project with legislative staff of then-Governor Schwarzenegger and, beginning in 2011, with Jacob Appelsmith, then a Senior Advisor to Governor Brown.

41.      Negotiation of a compact between the Tribe and State began in earnest in the final days of August 2012 with the approach of the one-year deadline for Governor Brown to concur in the Secretary's two-part determination of September 1, 2011, as set forth under 25 C.F.R. § 292.3(2)(b).  Following a thorough review of the Secretary's decision, the Governor indicated that he was giving serious consideration to concurring in the Secretary's two-part determination, but only if the Tribe would first agree to negotiate and enter into a tribal-state compact that provided the State and its residents with the same or similar protections as other

compacts in California.  At no point during the negotiations did Governor Brown or his staff object to the Tribe's right to negotiate a gaming compact under IGRA.

42.     Many of the draft compact provisions proposed by the Governor and accepted by the Tribe were similar or identical to provisions found in other tribal-state compacts which the California Legislature had previously ratified, including, *inter alia*, procedures for the reporting and auditing of revenues from class III gaming devices; licensing of the gaming facility, employees, resource suppliers, and financial sources; approval and testing of gaming devices; inspection and access to the gaming facility; operation and management of the gaming operation; resolution and arbitration of patron disputes, tort claims, and employee discrimination claims; environmental review and off-reservation mitigation of defined project activities; and resolution of compact disputes.

43.     On or around August 27, 2012, Sara Drake of the California Attorney General's office transmitted a draft compact to the Tribe's representatives.  She continued to circulate drafts to the Tribe's representatives over the next several days.  During the last weeks of August, a representative of the Tribe also regularly discussed the compact's potential provisions with Jacob Appelsmith, a Senior Advisor to the Governor.

44.     Like the other tribal-state compacts negotiated by Governor Brown, each of which was then ratified by the Legislature, the Governor's office also pressed for a number of revenue-related provisions based on financial projections for the Tribe's proposed gaming facility designed to mitigate the project's off-reservation impacts, to fund non-gaming and limited-gaming tribes, to pay state regulatory costs associated with the Tribe's gaming facility, and to advance other measures designed to increase the compact's benefits to the State of California.  The Tribe ultimately agreed to these provisions, including:

A.   The Tribal-State Compact Between the State of California and the Estom Yumeka Maidu Tribe of the Enterprise Rancheria ("the Compact") (a copy of which is attached as Ex. E) provides that "the Tribe has agreed, inter alia, to provide to the State, on a sovereign-to-sovereign basis, a portion of the Tribe's revenues from Gaming Devices operated pursuant to this Compact, for fair cost reimbursement of the cost of regulation and mitigation pertaining to the Tribe's Gaming Facility, for payments to Non-Gaming Tribes and Limited-Gaming Tribes, and for payments to mitigate potential impacts of the Gaming Facility on the local community."

B.   Section 4.5 of the Compact, which provides that "the Tribe shall pay quarterly to the State Gaming Agency for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund" for non-gaming and limited-gaming tribes a portion of "Net Win from all Gaming Devices operated in the Gaming Facility" of 11% in the first year, rising gradually to 15% in the fifth year and every year thereafter.

C.   Section 4.3 of the Compact, which provides that "The Tribe shall pay to the State on a pro rata basis the actual and reasonable 25 U.S.C. § 2710(d)(3)(C) costs the State incurs for the performance of all its duties under this Compact."

45.   In addition, as reflected in the Compact, "the Tribe entered into an enforceable and binding agreement with Yuba County to address impacts of the Tribe's Gaming Facility as a precondition to developing its Gaming Facility."  Further, "the Tribe entered into an enforceable and binding agreement with the City of Marysville to address impacts of the Tribe's Gaming Facility on the City."

46.     The Compact also notes that "the Board of Supervisors of Yuba County and the affected local community, including the City of Marysville and Olivehurst, have expressed support for the Tribe's proposed Gaming Facility on the 40-Acre Parcel."

47.     Section 14.2(a) of the Compact provides that "[o]nce effective, this Compact shall be in full force and effect for State law purposes until December 31, 2033."  Section 14.2(c) provides that "[i]f this Compact does not take effect by July 1, 2014, it shall be deemed null and void unless the Tribe and the State agree in writing to extend the date."

48.     The final proposed changes to substance and language were made in the course of email correspondence between the parties.  These changes were finalized on August 30, 2012.  The Tribe and Governor Brown signed the Compact on August 30, 2012.  (A copy of Governor's Brown's press release regarding the signing is attached as Ex. F.)

**D.     The Legislature's Failure to Act**

49.     Shortly after the parties signed the Compact, it was transmitted by the Governor's Office to the California Legislature.

50.     The Department of the Interior took the Yuba parcel into trust on behalf of the Tribe on May 15, 2013.  (A copy of the Bureau of Indian Affairs' Acceptance of Conveyance is attached as Ex. B.)  Accordingly, the Tribe has had jurisdiction over the Yuba parcel since at least May 15, 2013.  Shortly thereafter the Tribe's representatives informed the Governor's Office and members of the Legislature that the Yuba parcel was in trust and requested that the compact be ratified by the end of the regular legislative session that ended on September 12, 2013.  The Legislature, however, took no action to ratify the compact during the 2013 session.

51.     Throughout the first half of 2014, the Tribe and its representatives engaged in a concerted effort with the Governor's Office to secure legislative ratification of the Compact.  In May 2014, Assemblyman Adam Gray introduced AB 1098, legislation to ratify the Compact.

COMPLAINT                                    - 16 -

However, the Legislature held neither an informational hearing nor a vote on AB 1098.  Yet at no time did the Legislature articulate a single permissible rationale set forth under 25 U.S.C. 2710 § 2710(d)(3)(C) for not taking action to ratify the compact.

52.     In short, since receiving the Compact, the Legislature has taken no official action on it.  Nor has the Legislature conveyed any new proposed compact terms to the Governor.

53.     The Tribe and the State have not agreed in writing to extend the Compact's expiration date pursuant to Section 14.2(c) of the Compact.  Accordingly, as of July 1, 2014, the Compact expired by its own terms, pursuant to Section 14.2(c).

54.     Although the reasons for the Legislature's failure to ratify the Compact or to request the Governor to renegotiate any of its provisions are unclear, California State Senator Kevin de León, then-Chair of the Senate Appropriations Committee, wrote a letter to the Governor on July 29, 2013 that may relate to the Legislature's failure.  (A copy of the letter is attached as Ex. G.)  In the letter, Senator de León informed the Governor that the Senate was creating a working group to examine gaming compacts that allow Tribes to operate casinos on trust lands outside of their original reservations.  The Senator then asked the Governor not to submit for ratification any such gaming compacts.  In a news article concerning the letter dated August 2, 2013, the Los Angeles Times reported that Senator de León said he wanted Governor Brown to delay submitting the compact with the Enterprise Rancheria for legislative approval.  (A copy of the article is attached as Ex. H.) The article confirms that Governor Brown had received Senator de León's letter but nonetheless intended to work for compact ratification.

**E.      Negotiating a Gaming Compact**

55.     The Tribe is entitled to an order compelling the State to negotiate under 25 U.S.C. § 2710(d)(7)(B)(iii) if the State fails to negotiate, or fails to negotiate in good faith, to

enter into a tribal-state gaming compact, regardless of the State's reason for doing so.  *See, e.g.*, *Rincon Band*, 602 F.3d at 1041 (good faith is determined objectively by observing a State's actions rather than by examining a State's subjective reasons and beliefs).  A disagreement with allowing gaming on after-acquired trust lands pursuant to a two-part determination is not a permissible ground for failing to negotiate, or failing to negotiate in good faith, with the Tribe.

56.     Under IGRA, the process used to qualify newly acquired trust land for gaming purposes is not a permissible subject of negotiation over a tribal-state compact.  25 U.S.C. § 2710(d)(3)(C) (listing permissible subjects of compact negotiation).

57.     Failing to negotiate, or failing to negotiate in good faith, with the Tribe because of a disagreement with gaming on after-acquired trust lands—or, indeed, for any reason—is contrary to the purposes of IGRA, which include promoting economic development and self-sufficiency for all Indian tribes.  25 U.S.C. §§ 2701, 2702; S. Rep. No. 100-446, at 13.  IGRA's legislative history also reflects Congress's intent  "that the compact requirement for class III [gaming] not be used as a justification by a State for excluding Indian tribes from such gaming."  S. Rep. No. 100-446 (1988), at 13; *see also, e.g.*, *Rincon Band*, 602 F.3d at 1035 (quoting the Senate Report); *id.* at 1030 (IGRA "was not designed to give states complete power over tribal gaming such that each state can put the opportunity to operate casinos up for sale to the tribe willing to pay the highest price"); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 281 (8th Cir.1993) (noting that IGRA imposes mandatory duties upon states and gives them incentives to negotiate, but that it also provides tribes with alternative routes to a compact if the states choose not to cooperate).

58.     More than 180 days have passed since the Tribe requested that the State negotiate with it to enter into a tribal-state gaming compact.  More than 180 days have passed since the Governor transmitted the Compact to the Legislature, with no action by the

Legislature.  And more than 180 days have passed since the Yuba parcel was taken into trust for the Tribe.

59.      The State and the Tribe have not entered into a tribal-state compact.

60.      The State has not negotiated in good faith with the Tribe to enter into a tribal-state gaming compact.  Although the Governor initially negotiated and concluded a compact with the Tribe, good-faith negotiations require that the entity with authority to ratify an agreement—in this case, the Legislature—either do so or convey its objection to the negotiating parties so that an agreement can be reached.  Here, the Legislature has done neither, even though the Compact was transmitted to the Legislature nearly two years ago.

61.      Indeed, the State has not negotiated at all with the Tribe since the Compact was transmitted to the Legislature (or since the Yuba parcel was taken into trust for the Tribe), let alone negotiated in good faith.

## COUNT I

### (Claim for failure to negotiate in good faith (IGRA, 25 U.S.C. § 2710(d)(7)))

62.      The Tribe incorporates the preceding paragraphs as if fully set forth herein.

63.      The State of California has failed to negotiate in good faith with the Estom Yumeka Maidu Tribe of the Enterprise Rancheria for the purpose of entering into a tribal-state compact, in violation of IGRA.  *See* 25 U.S.C. § 2710(d)(3)(A); *id.* § 2710(d)(7).

64.      More than 180 days have elapsed since the Tribe's request for negotiations, since the transmission of the Compact to the Legislature, and since the Yuba parcel was taken into trust.

65.      The State and the Tribe have not entered into a tribal-state compact.

66.      Although the Governor of California and the Tribe initially negotiated and concluded a compact and, in doing so, acknowledged the Tribe's right to request negotiations

over such a compact, the California Legislature has failed either to ratify the Compact or to communicate new proposed terms to the Governor and/or the Tribe that would enable the Tribe and the State to address any permissible concerns the Legislature might have.

67.     Accordingly, the Tribe is entitled under IGRA to a declaration that the State has failed to negotiate in good faith as required by IGRA and to an order requiring the State to conclude a gaming compact with the Tribe within 60 days pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), failing which a compact will be selected by a mediator pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv), and providing that if the State fails to consent to the compact selected by the mediator within 60 days, the Secretary of the Interior shall prescribe, in consultation with the Tribe, the procedures under which the Tribe may conduct gaming on the Tribe's Indian lands, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii).

## COUNT II

**(Claim for failure to negotiate tribal-state gaming compact (IGRA, 25 U.S.C. § 2710(d)(7)))**

68.     The Tribe incorporates the preceding paragraphs as if fully set forth herein.

69.     The State of California has failed to negotiate with the Estom Yumeka Maidu Tribe of the Enterprise Rancheria for the purpose of entering into a Tribal-State compact for a period of more than 180 days, in violation of IGRA.  *See* 25 U.S.C. § 2710(d)(3)(A); *id.* § 2710(d) (7).

70.     More than 180 days have elapsed since the Tribe's request for negotiations, since the transmission of the Compact to the Legislature, and since the Yuba parcel was taken into trust.

71.     The State and the Tribe have not entered into a tribal-state compact.

72.     Although the Governor of California and the Tribe initially negotiated and concluded a compact and, in doing so, acknowledged the Tribe's right to request negotiations

over such a compact, the California Legislature has failed either to ratify the Compact or to communicate new proposed terms to the Governor and/or the Tribe that would enable the Tribe and the State to address any permissible concerns the Legislature might have.

73.     Indeed, the California Legislature has taken no action at all on the Compact, and the State has not negotiated at all with the Tribe over the Compact, since the Compact was transmitted to the Legislature shortly after the Governor signed it on August 30, 2012 or since the Yuba parcel was taken into trust for the Tribe on May 15, 2013.

74.     Accordingly, the Tribe is entitled under IGRA to a declaration that the State has failed to negotiate with the Tribe for a period of more than 180 days, in violation of IGRA, and to an order requiring the State to conclude a gaming compact with the Tribe within 60 days pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), failing which a compact will be selected by a mediator pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv), and providing that if the State fails to consent to the compact selected by the mediator within 60 days, the Secretary of the Interior shall prescribe, in consultation with the Tribe, the procedures under which the Tribe may conduct gaming on the Tribe's Indian lands, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court issue the following:

75.     A declaration that the State has not negotiated in good faith with the Tribe, and has failed to negotiate with the Tribe, to enter into a tribal-state gaming compact, in violation of 25 U.S.C. § 2710(d)(3).

76.     An order requiring the State to conclude a gaming compact with the Tribe within 60 days pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), failing which a compact will be selected by a mediator pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv), and providing that if the State fails to consent to the compact selected by the mediator within 60 days, the Secretary of the

COMPLAINT                                    - 21 -

Interior shall prescribe, in consultation with the Tribe, the procedures under which the Tribe may conduct gaming on the Tribe's Indian lands, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii).

77.     Any other relief that this Court deems just and appropriate.

DATED:  August 20, 2014                    Respectfully submitted,


By:  _____*/s/ Christopher E. Babbitt*_____

Attorneys for THE ESTOM YUMEKA MAIDU TRIBE OF THE ENTERPRISE RANCHERIA, CALIFORNIA