**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NORTH FORK RANCHERIA OF MONO INDIANS OF CALIFORNIA**, | 1:15-cv-00419-AWI-SAB |
| Plaintiff, | **ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| **STATE OF CALIFORNIA**, | (Docs. #19, 21) |
| Defendant. | |

### I. Introduction

Plaintiff North Fork Rancheria of Mono Indians of California ("North Fork" or "the Tribe") has brought suit against the State of California ("State" or "California") based on an alleged failure of the State to negotiate in good faith for the purpose of entering into a Tribal-State compact governing the conduct of class III gaming activities as required by the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2710(d)(3)(A). The parties have filed competing motions for judgment on the pleadings. This matter is ripe for adjudication.

### II. Background

The facts in this matter are not in dispute and are largely matters of public record. As will be more fully detailed, this case revolves around a Tribal-State compact which was approved by the Governor and ratified by the legislature before the issue was certified for referendum vote in

1

the November 2014 election. The people of the State of California voted "No" – overturning the legislative ratification of the Tribal-State compact.

Authorization of Tribal Gaming

In response in part to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987), where the Supreme Court rejected an attempt by the State of California to enforce its penal code section prohibiting operation of bingo halls against an Indian tribe, Congress enacted IGRA. 25 U.S.C. §§ 2701, 2702; *See Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 714-715 (9th Cir. 2003). IGRA was designed "to provide a statutory basis for the operation and regulation of gaming by Indian tribes." *Idaho v. Coeur D'Alene* Tribe, --- F.3d ----, 2015 WL 4461055 (9th Cir. July 22, 2015) (citation omitted). IGRA created three classes of gaming, each subject to a different regulatory scheme. *Artichoke Joe's*, 353 F.3d at 715. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming … in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class II gaming consists of bingo, and card games that are explicitly authorized or not explicitly prohibited by the State. 25 U.S.C. § 2703(7)(A).[1] Class III gaming activities are defined residually; all gaming activity that is not class I or class II activity falls within class III. In order for a tribe to conduct class III gaming it must, among other things, enter into a Tribal-State compact with the State.

On March 7, 2000, California voters approved Amendment 1A to the California Constitution, permitting federally recognized Indian tribes to operate certain specified betting games on Indian lands if authorized by the Governor in a Tribal-State compact that is then ratified by the legislature. 2000 Cal. Legis. Serv. Prop. 1A – Gambling on Tribal Lands (Ca. 2000); *amending* Cal. Const. Art. IV, § 19(f).

Gaming Site Acquisition History

---

[1] "Banking" card games – where the player plays against the house – and slot machines are categorically excluded from Class II gaming. 25 U.S.C. § 2703(7)(B).

North Fork is a federally recognized Indian tribe, listed in the Federal Register.[2] Prior to the initiation of the plan to build a gaming facility, the Tribe possessed only a 61.5 acre-parcel in North Fork, California (which lies within the Sierra National Forest), held in trust by the United States for development of a community center, a youth center, and homes. Complaint, Doc. 1. ("Compl.") at ¶ 33; *but see* Compl. Exh. B, Dept. of the Interior, Bureau of Indian Affairs, Letter to Gov. Brown, Sept. 1, 2011, Doc 1-4 ("BIA Letter") at 3 ("The Tribe currently possesses 80 acres of land (Rancheria) in Madera County, which is held in trust for its benefit by the United States."); Compl. at ¶ 31. In 2004, the Tribe put into action its plan to build a gaming facility by starting down the path to acquisition of land in Madera County. Compl. at ¶ 36. A lengthy environmental impact study ("EIS") – with opportunity provided for public notice and comment – was conducted and the results published on August 6, 2010. BIA Letter at 20.

After reviewing the results of the EIS, the submissions of state and local officials and surrounding Indian tribes,[3] and the likely economic impact on North Fork and the surrounding communities, the BIA recommended approval of (and requested the California Governor's concurrence with) the Tribe's bid for acquisition in trust of an approximately 305 acre plot of land in Madera County ("Madera parcel") for the benefit of North Fork pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, in anticipation of North Fork's construction of a class III gaming facility as contemplated by IGRA. *See* Compl. at ¶39-40; *see generally* BIA Letter. California's Governor, Edmund Brown, Jr., gave his concurrence with the BIA recommendation on August 30, 2012. His letter of concurrence detailed his reasoning for supporting the plan: the thoroughness of the federal inquiry; the benefit to North Fork; the benefit to surrounding tribes, as a result of the contributions to the Revenue Sharing Trust Fund; the relatively rural nature of the area that would house the gaming facility; and North Fork's significant historical connection with the land.

---

[2] *See* Bureau of Indian Affairs Tribal Leaders Directory at p. 68, located at http://www.bia.gov/cs/groups/public/documents/text/idc002652.pdf (last accessed November 5, 2015).
[3] The Assistant Secretary for the BIA made note that he considered the comments by the Picayune Rancheria of Chukchansi Indians ("Picayune") despite the fact that no tribe fell within the definition of "nearby Indian tribe" because no other recognized tribe possessed lands within the required 25-mile radius of the proposed gaming facility. BIA Letter at 42 (citing 25 C.F.R. § 292.2).

On February 5, 2013, the federal government took the Madera parcel into trust for North Fork pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, in anticipation of North Fork's construction of a class III gaming facility as contemplated by IGRA. Compl. at ¶¶ 2, 43.

Tribal-State Compact History

In July of 2004, soon after the Tribe started down the road to acquiring the Madera parcel, it entered into discussions with representatives of the then-Governor, Arnold Schwarzenegger, regarding framing of a Tribal-State compact. Compl. at ¶ 44. Those discussions bore fruit in April of 2008 when Governor Schwarzenegger and the Tribe executed a gaming compact ("2008 Compact"). However, because the acquisition of the Madera parcel was stalled due to the lengthy EIS process, the 2008 Tribal-State compact was never presented to the legislature.

A second draft of the Tribal-State compact prepared by the Governor's office and the North Fork Tribe was presented to Governor Brown.[4] That second draft addressed the concerns raised by the EIS by including provisions designed to minimize the environmental impact of the gaming facility. *See* Compl. Exh. L, Docs. 1-14 – 1-16 ("2012 Compact"). On the same date that the Governor gave his concurrence to the BIA recommendation for taking the Madera parcel into trust, August 30, 2012, his office executed a Tribal-State compact with North Fork and forwarded that compact to the legislature for ratification. Compl. at ¶ 48. Ratification of the 2012 Compact was proposed in the 2013-2014 California Legislative Session as Assembly Bill 277 ("AB 277").[5] AB 277 (Hall), 2013-2014 Leg. Sess. (Cal. July 3, 2013) *chaptered at* 2013 Stat. Ch. 51; Cal. Govt. Code § 12012.59.

On May 2, 2013, the California Assembly passed AB 277; on June 27, 2013, the California Senate passed AB 277; and on July 3, 2013 the Governor approved AB 277 and it was

---

[4] Although not the focus of this case, a parallel compact was submitted along with the North Fork Compact; that compact was between the Wiyot Tribe and the State. Generally, the Wiyot compact provided that the Wiyot would not seek to build a gaming facility and in exchange they would receive a share of the profits obtained from the North Fork gaming facility.

[5] AB 277 also proposed ratification of the Wiyot Compact, as the two were tied to the same proposed gaming facility.

filed with the Secretary of State. *See* Cal.Govt.Code. § 12012.59. At some time shortly thereafter,[6] California's then-Secretary of State, Deborah Bowen, forwarded the compact to the Secretary of the Interior for review and approval pursuant to 25 U.S.C. § 2710(d)(8). Compl. at ¶ 49. *See* Cal. Govt. Code § 12012.25(f). On October 22, 2013, the Assistant Secretary of the Interior, Bureau of Indian Affairs, issued notice that the compact between the State and North Fork was approved (to the extent that it was consistent with IGRA). Notice of Tribal-State Class III Gaming Compact taking effect, 78 FR 62649-01 (Oct. 22, 2013).

On July 19, 2013, a ballot summary and title were issued by the Attorney General of California's office for what would be commonly known as California Proposition 48 – Referendum on Indian Gaming Compacts (2014).[7] On October 1, 2013, proponents of the referendum submitted 784,571 signatures from registered voters in support of placing Proposition 48 on the ballot for the November 2014 election.[8] The then-Secretary of State, Debra Bowen, certified that the signatures submitted contained a sufficient number of valid signatures to place the matter on the ballot. *Id.*; *see* Cal. Const. Art. II, § 9(b).

On November 4, 2014, California voters rejected Indian Gaming Compacts Referendum, labeled Proposition 48, to ratify the North Fork and Wiyot Tribe compacts.[9] Based on that referendum vote, the State of California refuses to recognize the existence of a valid Tribal-State compact with North Fork. The validity of the referendum and compact is the subject of litigation now pending before the California Fifth District Court of Appeal. *See Stand Up for California v. State of California et al.*, 5th DCA Case No. F070327, filed Dec. 27, 2014.

---

[6] The record is unclear as to the exact date that the California Secretary of State submitted the 2012 Compact to the United States Secretary of the Interior. However, based on the notice of approval issued by the Secretary of the interior – issued 45 days after its submission to the secretary by the Tribe and the State – it is likely that the California Secretary of State submitted the compact on or about September 7, 2013.

[7] Title and Summary located at https://www.oag.ca.gov/system/files/initiatives/pdfs/Title%20and%20Summary%20%2813-0007%29.pdf? (last accessed November 5, 2015); Title and summary proposal located at https://oag.ca.gov/system/files/initiatives/pdfs/13-0007%20(13-0007%20(Referendum%20of%20AB%20277)).pdf (last accessed November 5, 2015).

[8] Referendum Signatory Recognition Letter, Debra Bowen, November 20, 2013, located at https://web.archive.org/web/20141028155549/http://www.sos.ca.gov/elections/ccrov/pdf/2013/november/13101km.pdf (last accessed November 5, 2015) ("Recognition Letter").

[9] Index of California Referenda located at http://www.sos.ca.gov/elections/ballot-measures/referendum/ (last accessed November 5, 2015).

After the 2014 referendum, the State refused to enter into negotiations with North Fork regarding a new Tribal-State compact, concluding that any attempt at negotiation a compact regarding the Madera parcel would be futile. Compl. at ¶ 60, Exh. G. On that basis, North Fork brings the instant action, contending that the State's failure to negotiate triggers the remedial provisions of IGRA.

IGRA Remedial Framework

Section 2710(d)(3)(A) of Title 25 of the United States Code provides:

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

The good faith negotiation section of IGRA is not without teeth. Sections 2710(d)(7)(B)(i)-(vii) provide a detailed remedial scheme designed to prevent a State from seeking to wrongfully inhibit an Indian tribe from engaging in Class III gaming activity. Under that procedure, 180 days after an Indian tribe requests the opening of negotiations with the state, that Indian tribe may bring suit to (1) compel a state to enter into negotiations with the tribe for the purpose of entering into a compact, or (2) to compel a state to negotiate in good faith. 25 U.S.C. § 2710(d)(7)(B)(i); 25 U.S.C. § 2710(d)(7)(A)(i).[10] In one such action, an Indian tribe must first introduce evidence that (1) a Tribal-State compact has not been entered, and (2) the state (a) did not respond to the request to negotiate, or (b) did not respond to the request in good faith. 25 U.S.C. § 2710(d)(7)(B)(ii). Thereafter, the burden shifts to the State to prove that it negotiated in good faith to conclude a compact. *Id.*

---

[10] In *Seminole Tribe v. Florida*, 517 U.S. 44 (1996) ("*Seminole*") the Supreme Court held that Congress sought to impermissibly abrogate Eleventh Amendment immunity in authorizing Indian tribes to sue the state pursuant to IGRA. In order to avoid offending the Eleventh Amendment, a State must explicitly consent to suit. *Id*. California has consented to suit. Cal. Govt. Code § 98005 ("[T]he State of California … submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith….")

Based on the submissions of the Indian tribe and the State, the court must determine whether the State failed to negotiate in good faith. In making that determination the court may consider "public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities"; the court "shall consider any demand for taxation" by the State as evidence that negotiation was not conducted in good faith. 25 U.S.C. § 2710(d)(7)(B)(iii). If the court finds an absence of good faith, it "shall order the state and Indian Tribe to conclude … a compact within a 60-day period." *Id.*

If, after 60 days, no compact has been entered, the parties will submit to mediation wherein each party will submit a proposed compact to the mediator and the mediator will select the compact most in line with federal law and the findings of the court. 25 U.S.C. § 2710(d)(7)(B)(iv). Thereafter the State has 60 days to consent to the compact selected. 25 U.S.C. § 2710(d)(7)(B)(vi)-(vii). If the State fails or refuses to do so, the mediator will forward the selected compact to the Secretary of the Interior who prescribes, in consultation with the Indian tribe, procedures under which Class III gaming may be conducted. 25 U.S.C. § 2710(d)(7)(B)(vii).

### III. Legal Standard

Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "A motion for judgment on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir.2003). "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Pit River Tribe v. Bureau of Land Management*, 793 F.3d 1147, 1155 (9th Cir. 2015) (quoting *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir.2012)). Judgment on the pleadings is appropriately granted in favor of a defendant when, even if all of the allegations in the pleadings are true, the defendant is entitled to judgment as a matter of law. *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993). Similarly, judgment on the

pleadings is appropriately granted in favor of a plaintiff when, assuming the truth of the pleadings, the plaintiff is entitled to judgment as a matter of law. If there is a material dispute in the parties' pleadings, a motion for judgment on the pleadings cannot be granted.

### IV. Discussion

The Court will address its jurisdiction and the State's waiver of sovereign immunity, then the two IGRA violations alleged by North Fork. In the first of the alleged IGRA violations, North Fork contends that the State failed to negotiate in good faith toward and enforceable compact – within the meaning of 25 U.S.C. § 2710(d)(7) – when it "refus[ed] to honor the 2012 Compact based on the … referendum" vote. Compl. at ¶ 72. Second, it alleges that the State had a duty to continue negotiation after the referendum yet refused to enter into negotiations. *Id.* at ¶¶ 75-79. The Court need only decide the second alleged IGRA violation.

A. Jurisdiction and Waiver of Sovereign Immunity

The State has raised Eleventh Amendment immunity as a defense in this action. It alleges that the Court's jurisdiction over this action is restricted to the State's negotiation with the tribe – a role delegated under California law exclusively to the Governor. Because this defense would, if successful, divest this Court of jurisdiction over a portion of this action, the Court addresses this argument before the merits of the Tribe's case.

In *Seminole*, 517 U.S. 44, the Supreme Court held that in authorizing Indian tribes to sue the state pursuant to IGRA, Congress impermissibly sought to abrogate Eleventh Amendment immunity. In order to avoid offending the Eleventh Amendment, a State must explicitly consent to suit. *Id.* California has consented to suit for IGRA actions in limited circumstances. Specifically, California Government Code section 98005 provides that "the State of California … submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a … Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith…."

The State draws the Court's attention to the fact that under the California Constitution only the Governor has the authority to negotiate compacts with an Indian tribe. Doc. 21-1 at 21

1  (citing Cal Const. art IV, §19(f) ("[T]he Governor is authorized to negotiate and conclude

2  compacts [with Indian tribes], subject to ratification by the Legislature."). *See* Cal Gov't Code §

3  12012.25(d) ("The Governor is the designated state officer responsible for negotiating and

4  executing, on behalf of the state, tribal-state gaming compacts … pursuant to [IGRA].") It

5  contends that the jurisdictional grant of section 98005 applies only to suits based on the

6  Governor's conduct because, under California law, the Governor is the only person authorized to

7  negotiate on behalf of the State. The State therefore contends that because North Fork alleges

8  that the state as a whole – rather than the Governor – has failed to negotiate, the Court lacks

9  jurisdiction over the portion of this action that relating to conduct by actors other than the

10 Governor. The Court disagrees.

11      In 1998, in an effort to resolve conflicts between the State of California and Indian tribe

12 relative to class III gaming, an initiative measure proposing section 98005 – Proposition 5 – was

13 presented to California voters as part of the Tribal Government Gaming and Economic Self-

14 Sufficiency Act of 1998. *See Hotel Employees and Restaurant Employees International Union v.

15 Davis*, 21 Cal.4th 585, 597-598 (1999) ("*Hotel Employees*"); *but see Artichoke Joe's*, 353 F.3d at

16 717 ("A coalition of California tribes drafted Proposition 5.") The people of the State of

17 California approved Proposition 5 on the November 1998 ballot.[11] In *Hotel Employees*, 21

18 Cal.4th at 615-616 (1999), the California Supreme Court found the whole of the Tribal

19 Government Gaming and Economic Self-Sufficiency Act of 1998, with the exception of the

20 waiver of immunity provision of Section 98005, to be in violation of the anticasino provision of

21 article IV, section 19, subdivision (3) of the California Constitution. The amendment to Section

22 19, allowing for tribal gaming, was proposed after the State consented to jurisdiction (*see* 1999

23 Cal. Legis. Serv. Res. Ch. 142 (S.C.A. 11)) as then-Governor Davis' response to *Hotel

24 Employees. See Rincon Band of Luiseno Mission Indians of Rincon Reservation v.

25 Schwarzenegger*, 602 F.3d 1019, 1050 (9th Cir. 2010) (Bybee, J. dissenting). The amendment to

26 Section 19 was placed on the March 2000 ballot as Proposition A1 and was approved by voters.

27

28 [11] The Act was codified at California Government Code section 98001 to 98012. The jurisdiction granting language of section 98005 was enacted in 1998 in an apparent response to *Seminole*.

1   *Id.* Similarly, Section 12012.25 of the Government Code was not added until October 10, 1999

2   (*see* 1999 Cal. Legis. Serv. Ch. 874 (A.B. 1385)), also in response to *Hotel Employees*. As a

3   result, neither the amendment to the California Constitution nor Government Code section

4   12012.25 inform the scope of the consent to jurisdiction that the State of California intended in

5   section 98005. Instead, upon comparison of the consent to jurisdiction in section 98005 with the

6   jurisdiction-granting language of IGRA, it appears that section 98005 was designed to provide a

7   waiver of jurisdiction coextensive with IGRA's  jurisdictional grant. *Compare* Cal. Gov. Code §

8   98005 ("[T]he State of California also submits to the jurisdiction of the courts of the United

9   States in any action brought against the state by any federally recognized California Indian tribe

10  asserting any cause of action arising from the state's refusal to enter into negotiations with that

11  tribe for the purpose of entering into a … Tribal-State compact pursuant to IGRA or to conduct

12  those negotiations in good faith….") *with* 25 U.S.C. § 2710(d)(7)(A)(i) ("The United States

13  district courts shall have jurisdiction over (i) any cause of action initiated by an Indian tribe

14  arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose

15  of entering into a Tribal-State compact … or to conduct such negotiations in good faith….")

16          Moreover, the two provisions that the State relies upon are inconsistent with the then-

17  existing law; the Governor's role as the exclusive negotiator (i.e. the only entity negotiating on

18  behalf of the State) and acting exclusively as the negotiator (i.e. not possessing the power to

19  enact or ratify a compact) was not in place when consent to suit was given. Section 98002 was

20  enacted as part of the now-largely-invalidated Tribal Government Gaming and Economic Self-

21  Sufficiency Act of 1998. It required the Governor to enter into any negotiations required by

22  IGRA *and* authorized the Governor "to reach agreement and execute that compact on behalf of

23  the state[;] [exercise of that] authority [did] not require action by the Legislature…" except in

24  limited circumstances.[12] Cal. Gov't Code § 98002(b). Under the Tribal Government Gaming and

25  Economic Self Sufficiency Act, the Governor may have been the only person likely to have been

---

26  [12] Legislative action was required if "the compact … expand[ed] the scope of class III gaming permitted under a
27  Gaming Compact under [the Tribal Government Gaming and Economic Self-Sufficiency Act], create[ed] or
    confer[ed] additional powers on any agency of th[e] [S]tate that [were] inconsistent with the terms of a Gaming
28  Compact, or infringe[ed] upon the power of the Legislature to appropriate and authorize the expenditure of funds
    from the State Treasury." Cal. Gov't Code § 98002(b).

in a position to exercise power that could give rise to an IGRA claim. Even in light of that fact, section 98005 uses the term "State of California" rather than "Governor" in consenting to jurisdiction, lending to the conclusion that the State as a whole is subject to jurisdiction.

Further, as North Fork correctly notes, as enacted, section 98005 separately uses the terms "State of California" and "Governor."[13] Because both terms are used in the same statute (and non-interchangeably throughout the Act), fundamental principles of statutory interpretation compel the Court to presume that the term "Governor" is not interchangeable with "State of California." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."); *see also United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction … is a holistic endeavor," requiring examination of seemingly ambiguous provisions in the context of the "remainder of the statutory scheme….")

In sum, this Court finds that the State has consented to federal jurisdiction regarding the State's failure to negotiate or negotiate in good faith with an Indian tribe; the consent to jurisdiction is not limited to an action against the State of California based on conduct by the Governor. *See also Big Lagoon Rancheria v. California*, 789 F.3d 947, 950 n.1 (9th Cir. 2015) (en banc) (citing *Rincon*, 602 F.3d at 1026 (9th Cir. 2010)) (The State of California "has waived its immunity to suit" where it is sued for failure to negotiate in good faith concerning class III gaming rights.); *Fort Independence Indian Community v. California*, 679 F.Supp.2d 1159 (E.D. Cal. 2009) (recognizing jurisdiction over an action pursuant to IGRA against "the State of California and associated officials"). In fact, the language and legislative history of IGRA make clear that the State itself – rather than any of its agents – is the proper party. *See* 25 U.S.C. § 2710(d)(7)(A)(i) (District Courts have jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to" negotiate in good faith regarding class III gaming rights); S. Rep. 100-446, *14 (1988) (noting that IGRA "grants a tribe the right to sue a

---

[13] The portion of section 98005 that uses the term "Governor" has since been invalidated. That said, the Court considers the whole of that statute and the whole of the Tribal Government Gaming and Economic Self-Sufficiency Act of 1998 in determining the scope of the State's consent to jurisdiction.

1  state if compact negotiations are not concluded"); *Seminole,* 517 U.S. at 75 (holding that IGRA

2  requires that any action brought by the Tribe for a failure to engage in good faith negotiation be

3  brought against the state itself rather than against a state officer under *Ex parte Young*); *see also*

4  *Pueblo of Sandia v. Babbit,* 47 F.Supp.2d 49, 52 (D.D.C. 1999) (holding that the state is an

5  indispensable party in an IGRA action). Although the State's liability is based on the conduct of

6  its agents, it is the State that is the proper defendant when a tribe alleges a failure to negotiate in

7  good faith. *See Seminole,* 517 U.S. at 75; *Big Lagoon Rancheria*, 789 F.3d at 947 (engaging in a

8  discussion of the Governor's conduct in negotiating where the action named only the State of

9  California as a defendant).

10  B. Negotiations Conducted after the November 2014 Referendum [14, 15]

11      North Fork alleges that the State violated IGRA in failing to negotiate with the Tribe after

12  the 2014 referendum. Compl. at ¶¶ 75, 78. The Tribe argues, assuming that the referendum vote

13  and the State's refusal to recognize the 2012 Compact were in full compliance with the good

14  faith requirements, the Governor's refusal to negotiate with the tribe *after* the referendum vote

15  violates the good faith negotiation requirement of IGRA. The State notes that its refusal to enter

16  into negotiations regarding a new tribal-state compact was limited to the Madera parcel. It

17  contends that in light of the "fact that the people had recently 'voted overwhelmingly to reject

18  Proposition 48'… for the Madera [p]arcel," the State did not act in bad faith in refusing to

19  negotiate regarding that land. Doc 21-1 at 20.

20      In order to prevail on this claim, the Tribe must (1) "introduce evidence that 'a Tribal-

21  State compact has not been entered into …,' and [(2)] 'the State [(a)] did not respond to the

22  request to negotiate … or [(b)] did not respond … in good faith.'" *Pauma Band of Luiseno*

23  *Mission Indians v. California*, --- F.3d ----, 2015 WL 6445610, *12 (9th Cir. Oct 26, 2015)

24  (quoting 25 U.S.C. § 2710(d)(7)(B)(I-II)) (emphasis removed). As to the first question, it is

25  undisputed that the State and the Tribe have not entered into an enforceable compact.

26  _____

27  [14] This issue is not dependent on the Court's determination of the scope of consent to jurisdiction that the State of California has given. The parties agree that the State of California can be held responsible if the Governor fails to negotiate in good faith as required by IGRA. *See* Docs. 21-1 at 21, and 23 at 14.

28  [15] For purposes of this cause of action, the Court assumes that none of the events up to and including the referendum offended IGRA.

**1. Refusal to Negotiate**

The State concedes that it refused to negotiate with the Tribe regarding construction of a class III facility on the Madera parcel after the 2014 referendum. North Fork characterizes the refusal to negotiation over the Madera parcel as an independently actionable failure that triggers the remedial provisions of IGRA. Doc. 19-1 at 27; Doc. 22 at 23. The State asserts that its refusal to enter compact negotiations with North Fork was location-specific to the Madera parcel; it did not reject negotiations altogether. Doc. 21-1 at 20. Instead, the State contends that it was willing to negotiate over a different construction site for the proposed gaming facility. *Id.*

The Court must determine whether the State's responses to North Fork's letters constituted a "failure to enter into negotiations" for purposes of IGRA. 25 U.S.C. § 2710(d)(7)(A)(i). Section 2710(d)(3)(A) provides that an "Indian tribe having jurisdiction over the lands upon which a class III gaming activity is being conduct, or is to be conducted, shall request" that the state engage in negotiations. 25 U.S.C. § 2710(d)(3)(A) (emphasis added). An obligation for a state to negotiate in good faith is triggered when (1) an Indian tribe that (2) possesses Indian land – defined by section 2703(4)(B) to include "any lands title to which is held in trust by the United States for any Indian [t]ribe" – not otherwise ineligible for gaming,[16] and (3) requests that the state enter into negotiations. *Mechoopa Indian Tribe of Chico Rancheria v. Schwarzenegger*, 2004 WL 1103021, *5 (E.D. Cal. Mar. 12, 2004) (quoting *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002) ("*Engler*")).

North Fork sent letters on June 27, 2014 (pre-referendum) and January 2, 2015 (post-referendum) to Joginder S. Dhillon, Senior Advisor for Tribal Negotiations, "request[ing] that the State of California … enter into negotiations with [North Fork] … for the purpose of entering into a … compact governing the conduct of class III gaming activities on [the Madera parcel]." Doc. 1-6 at 2; *see* Doc. 1-7. The State responded to the pre-referendum letter on July 8, 2014, declining to enter into negotiations and indicating that the request for negotiation was

---

[16] Section 2719 restricts the use of Indian lands acquired after October 17, 1988. It is undisputed in this case that the Madera parcel falls within an exception to the general prohibition of use of after-acquired land. *See* 25 U.S.C. § 2719(b)(1)(A).

13

premature because the referendum vote regarding the 2012 Compact had not yet occurred. Doc. 1-8 at 2. The State responded to the post-referendum letter on January 16, 2015, again declining to enter into negotiations regarding the Madera parcel because, "[g]iven that the people have spoken, entering into [such] negotiations … would be futile." Doc 1-9 at 2.[17] The State continued, explaining that "[e]ven if [it] concluded that further negotiations on the Madera parcel could be productive, a compact with terms similar to the last one would face an uncertain fate in the Legislature and, if approved, almost certainly would be subjected to another referendum or even litigation…." *Id.*

North Fork is undisputedly an Indian tribe within the meaning of 25 U.S.C. § 2703(5). *See* Compl. at ¶ 2. It is also undisputed that both the 80-acre reservation in North Fork, California and the Madera parcel are gaming-eligible Indian lands within the meaning of 25 U.S.C. §§ 2703(4) and 2719(b)(1)(A). As to the North Fork request for negotiations, if nothing else, the post-referendum letter sent on January 2, 2015, was a request that the State enter into negotiations regarding the Madera parcel. *See* Doc. 1-7. The text of § 2710(d)(3)(A) is not explicit as to whether Congress had envisioned that Indian tribes would submit requests to negotiate regarding specific parcels of Indian lands or whether the request was to be made regarding all eligible Indian lands. In *Engler*, the Sixth Circuit explained that the requirement that the Tribe possess Indian lands is significant, in part, because it "give[s] the State notice of where [the gaming site] will be…. In the absence of a location, the State would have no way to assess the environmental, safety, traffic, and other problems that such a casino could pose." *Engler*, 304 F.3d at 618. Such a reading is consistent with the requirement that an Indian tribe request negotiations regarding "the lands upon which a class III gaming activity … is to be conducted." *See* 25 U.S.C. § 2710(d)(3)(A); *see also Big Lagoon Rancheria*, 789 F.3d at 951 (noting that "the State … negotiate[ed] with Big Lagoon Rancheria directly with respect to" a specific eleven-acre parcel). Otherwise, an Indian tribe possessing at least two tracts of non-contiguous Indian lands that generally requests negotiations over its lands without specifying "the lands upon which ... [the] gaming activity … is to be conducted" would not place the State

---

[17] The State's post-referendum letter is attached to this Order as Attachment A.

14

on notice of the location of the gaming site, as is required. A request for negotiations should specify a particular piece of land for the proposed gaming site. North Fork's request that the State "negotiate with the Tribe, pursuant to 25 U.S.C. § 2710(d)(3)(A), to enter into an enforceable compact regarding class III gaming on the Madera [p]arcel" (Doc. 1-6 at 2; *see* Doc 1-7 at 2) was a request for negotiations within the meaning of 25 U.S.C. § 2710(d)(3)(A).

The State's post-referendum letter in response to North Fork's requests for negotiations can only be reasonably interpreted as a denial of that request.[18] On that basis, the Court must order the parties to reach an agreement within 60 days pursuant to § 2710(d)(7)(B)(iii).

**2. Good Faith Negotiation**

Assuming arguendo that the State's response was not a refusal to enter into negotiations but an attempt at negotiation, that attempt was not in good faith within the meaning of IGRA.

In coming to that conclusion the Court limits the inquiry to the question of whether a state negotiates in good faith when it refuses to permit class III gaming on a specific parcel of gaming-eligible Indian land – without reference to any § 2710(d)(3)(C) topic – notwithstanding the fact that the United States Secretary of the Interior had concluded that the Tribe's only other lands are "remote, environmentally sensitive…, difficult to access," and generally "far less compatible" with the operation of a gaming facility. *See* Doc. 1-4 at 49. To answer that question, this Court first looks to the permissible scope of the parties' negotiations. IGRA sets out the provisions that may be contained in a compact governing class III gaming (*see* 25 U.S.C. § 2710(d)(3)(C)(i-vii)) and what courts may consider in determining whether the a state negotiated in good faith (*see* 25 U.S.C. § 2710(d)(7)(B)(iii)(I)). A compact may contain provisions relating to:

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

---

[18] The Court finds the State's argument that its response was not a refusal to negotiate because North Fork could have requested that the parties enter into negotiations regarding "Indian lands in California other than the Madera parcel" unpersuasive. No part of that letter invited North Fork to propose an alternate location or even suggested that such a proposal would be considered.

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C)(i-vii). In determining whether the State has negotiated (regarding the permissible § 2710(d)(3)(C) topics) in good faith, a court "may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities…." 25 U.S.C. § 2710(d)(7)(B)(iii)(I).

In *Rincon*, the Ninth Circuit Court of Appeal explained that § 2710(d)(3)(C) provides an exhaustive list of provisions that may be contained in a compact, specifically noting that "IGRA limits [the] permissible subjects of negotiation" to those topics. *Rincon*, 602 F.3d at 1028-1029, n.9; *accord In re Indian Gaming Related Cases*, 331 F.3d 1094, 1111 (9th Cir. 2003) ("*Coyote Valley II*"); *see Seminole Pueblo of Santa Ana v. Nash*, 972 F.Supp.2d 1254, 1265 (D. NM. 2013); *Fort Independence Indian Community v. California*, 679 F.Supp.2d 1159, 1172 (E.D. Cal. 2009); S. Rep. 100-446 at *14; *but see Wisconsin Winnebago Nation v. Thompson*, 824 F.Supp. 167, 171 (W.D. Wis. 1993) ("*Wisconsin Winnebago I*") (IGRA "denotes some, but not all of the considerations that should be addressed in concluding a tribal-state compact.") *aff'd on other grounds* 22 F.3d 719, 724 (7th Cir. 1994) ("*Wisconsin Winnebago II*") (assuming that IGRA gives tribes the right to set the location of a gaming facility anywhere on tribal land, but holding that a tribe could not demand negotiation over an additional gaming facility immediately after concluding a different compact with the state). Reading § 2710(d)(3)(C) as exhaustive is consistent with the report by the Senate Select Committee on Indian Affairs which explains that "[s]ection [2710](d)(3)(C) describes the issues that may be the subject of negotiations between

16

the tribe and State in reaching a compact." S. Rep. 100-466 at *14. That reading is also consistent the Congressional intent to limit the framework for compact negotiations between tribes and states to those topics that have a direct relationship to the operation of gaming activities so as to prevent compacts from being used as a subterfuge for imposing state jurisdiction on tribes concerning issues unrelated to gaming. *Id.*; *see Coyote Valley II*, 331 F.3d 1094, 1111 (9th Cir. 2003). An attempt to negotiate (or refusal to negotiate based on) topics not enumerated in § 2710(d)(3)(C) violates a state's duty to negotiate in good faith. *See Fort Independence*, 679 F.Supp.2d at 1172. (An attempt to negotiate topics outside of § 2710(d)(3)(C) is "strong, if not determinative, evidence of bad faith.")[19]

The State relies heavily upon *Wisconsin Winnebago I* for the proposition that a state may refuse to negotiate over a specific piece of gaming-eligible Tribal land without triggering the remedial provisions of IGRA. Doc. 23 at 12-13. The Court does not find *Wisconsin Winnebago I* persuasive for three reasons. First, *Wisconsin Winnebago I* ruling relies upon the determination that the items articulated in § 2710(d)(3)(C) are not an exhaustive list of the negotiation topics under IGRA. *Wisconsin Winnebago I*, 824 F.Supp. at 171 ("[T]he Act denotes some, but not all considerations that should be addressed in concluding a tribal-state compact.")[20] As discussed, in *Rincon* the Ninth Circuit made clear that the items articulated in § 2710(d)(3)(C) are the only permissible topics of negotiation for a tribal-state compact – at least partially undercutting the reasoning of *Wisconsin Winnebago I*. *Rincon*, 602 F.3d at 1028-1029, n.9.

Second, the *Wisconsin Winnebago I* court's determination that the location of a gaming facility falls within the catchall provision – any other subjects that are "directly related to the operation of gaming activities" – is an oversimplification. *Wisconsin Winnebago I*, 824 F.Supp.

---

[19] It is possible that negotiation of topics outside of those articulated in § 2710(d)(3)(C) may not be per se bad faith negotiation. *See Big Lagoon Rancheria v. California*, 789 F.3d at 955. However, even if negotiation of a topic outside of the "exhaustive" list, *Rincon*, 602 F.3d at 1029, n.9, presented by IGRA is permissible, such negotiation must be accompanied by "meaningful concessions" on the part of the state. *See Big Lagoon Rancheria*, 789 F.3d at 955; *Coyote Valley II*, 331 F.3d at 1111. There has been no suggestion by the State that it offered any meaningful concession in exchange for its refusal to negotiate over the Madera parcel.

[20] *Wisconsin Winnebago I* has been relied upon (without discussion) in this district for the proposition that a "gaming facility's location is subject to negotiation during the compacting process." *Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, 2004 WL 1103021, *6 (E.D. Cal. Mar. 12, 2004). However, that case also predates *Rincon*.

at 171 (quoting 25 U.S.C. § 2710(d)(3)(C)(vii)). As a preliminary matter, no part of

§ 2710(d)(3)(C) explicitly provides that the location of a gaming facility is a permissible subject

of negotiation. In fact, most of the items concern licensing, regulation, taxation, and safe

operation standards. *See* 25 U.S.C. § 2710(d)(3)(C). The Ninth Circuit has considered the

catchall provision only twice in published opinions,[21] both in the context of a state requiring

payments by an Indian tribe, and with differing results. Section 2710(d)(3)(C)(vii) was found to

permit negotiation over a revenue sharing trust fund, requiring gaming tribes to share gaming

revenues with non-gaming tribes, and a state "special distribution fund," designed to offset any

negative effects of gaming activities, *Coyote Valley II*, 331 F.3d at 1110-1112, but not to permit

a state to negotiate a revenue sharing agreement whereby the State would apply tribal money

toward the State's general fund, *Rincon*, 602 F.3d at 1033-1024. In both instances, the Indian

tribe was required to contribute a portion of its gaming revenue. The Ninth Circuit has explained

that issues negotiated in *Coyote Valley II* were "fair distribution of gaming opportunities and

compensation for the negative externalities caused by gaming," *Rincon,* 602 F.3d at 1033, which

the Court found to be issues "directly related to the operation of gaming activities," 25 U.S.C.

§ 2710(d)(3)(C)(vii). The revenue sharing trust and special disbursement fund, the court

explained,  were merely "the means" that the parties agreed to remedy those issues. *Rincon*, 602

F.3d at 1033. In contrast, the *Rincon* court explained that requiring a tribe to make contributions

to the general fund did not implicate the same negotiable topics; that state's goal of requiring

contribution to the general fund was far too attenuated to be "directly related to the operation of

gaming activities." *Rincon*, 602 F.3d at 1033-1034. The approval of tribal revenue sharing in

*Coyote Valley II* and rejection of state revenue sharing in *Rincon* also rests in part upon the Ninth

Circuit's mindfulness of the Congressional purpose to "promote tribal economic development,

self-sufficiency, and strong tribal government." *Coyote Valley II*, 331 F. 3d at 1111 (quoting 25

U.S.C. § 2702(a)). Where there is any ambiguity in whether a topic is negotiated in good faith,

---

[21] A three-judge panel of the Ninth Circuit spoke more directly to the question of whether a state can negotiate over a particular plot of land in *Big Lagoon Rancheria v. California*, 741F.3d 1032, 1040 (9th Cir. Jan. 21, 2014) ("[A] tribe may only request negotiations to conduct gaming on *a particular piece of Indian land* over which it has jurisdiction.") (emphasis added), however, that portion of the decision was *vacated as moot on reh'g en banc*, 789 F.3d 947, 955-956 (June 6, 2015).

1    the Court interprets in the "manner that will be most favorable to tribal interests." S. Rep.

2    100-466 at *11; *accord Coyote Valley II*, 331 F.3d at 1108.

3           Location by itself, much like gaming revenue, is not the appropriate topic of negotiation

4    under 2710(d)(3)(C)(vii) because it has no direct relationship to the operation of gaming

5    activities. If, however, (1) the public interest, public safety, criminality, financial integrity,

6    adverse economic impacts on existing gaming activities, combatting negative externalities of

7    gaming, or some other state interest, (2) directly related to operation of gaming activity, were at

8    issue and moving the location of the gaming facility might be a means of remedying that issue,

9    then the location of the gaming facility may appropriately be introduced by the state.

10          In this instance, the State has flatly refused to negotiate with the tribe regarding the

11   Madera parcel. Again, assuming that the State sought its refusal to be an attempt to negotiate

12   regarding a different gaming site, that attempt would only be permitted as a means to remedy an

13   issue regarding a negotiable topic. The Secretary of the Interior determined and the Governor

14   concurred in the determination that gaming on the [Madera parcel] would: "be in the best

15   interests of the tribe and its members and would not be detrimental to the surrounding

16   community." Doc 1-4 at 5. Specifically, gaming on the Madera parcel would "provide an

17   opportunity for tribal citizens living far away to return to their community…, [an impact]

18   consistent with [the] overall policy of self-determination…," *Id*. at 9, "increase visitors to

19   Madera thereby benefitting the local economy as a whole," *Id.* at 10, "stimulat[e] tribal economic

20   development, promoting tribal self-sufficiency, and providing resources for the development of a

21   strong tribal government," *Id*., and "sustain … efforts of the Tribe and its citizens to revitalize

22   and maintain their unique Mono heritage, language, and traditions…." *Id*.  The Secretary also

23   concluded that proposed gaming site on the Madera parcel is "a distance from residential and

24   other sensitive areas" and will not disrupt those uses. *Id*. at 27. As to potential impacts on

25   neighboring gaming activities, the Secretary noted a potential economic impact on the Picayune

26   Tribe of Chukchansi Indians due to competition from the Tribe's proposed gaming facility but

27   concluded that competition alone is insufficient to determine that construction of the Tribe's

28   facility would result in a detrimental impact to the Picayune tribe. The State does not now

contend that any of the Secretary's determinations were incorrect, nor does it articulate any basis for its refusal to negotiate regarding the Madera parcel.

Similarly, the State does not allege that it refused to negotiate over the Madera parcel because some IGRA objective would be better served by construction of the gaming facility in a different location. As the State is aware, the Tribe's 80-acre Rancheria – the Tribe's only other Indian land eligible for gaming – is "remote, environmentally sensitive…, difficult to access," and generally "far less compatible" with the operation of a gaming facility. Doc. 1-4 at 49. The Madera parcel was taken into trust by the United States for the benefit of the Tribe for those very reasons.

The State has presented no legitimate state goal that could be accomplished by demanding a different location for the gaming site. Although not categorically prohibited, in this instance, the State has failed to show that its rejection of the Madera parcel as a gaming site was a permissible means of accomplishing a goal related to a § 2710(d)(3)(C) topic.

Third, *Wisconsin Winnebago I* is factually differentiable from the case at bar. In *Wisconsin Winnebago I*, the state of Wisconsin and the tribe had already concluded a compact when the tribe sought to reopen negotiations regarding a new gaming site. *Wisconsin Winnebago I*, 824 F.Supp. at 169. In the completed compact the state had agreed to three counties where gaming could be conducted but disallowed a fourth county, and specifically at a location known as the De Jope site. *Id*. Within a month of agreeing to the compact, the Wisconsin Winnebago tribe sought to reopen negotiations regarding the De Jope site. *Id*.; *Wisconsin Winnebago II*, 22 F.3d at 722. Because the parties had very recently concluded a compact which involved negotiation over the De Jope site, and because the concluded compact did not require additional negotiations over the De Jope site, the *Wisconsin Winnebago I* court held that the tribe could "not rely on [IGRA] to compel defendant to negotiate at [that] time over Class III gaming at the De Jope site." *Wisconsin Winnebago I*, 824 F.Supp. at 172; *accord Wisconsin Winnebago II*, 22 F.2d at 724. In coming to its conclusion, the *Wisconsin Winnebago I* court specifically noted that the tribe should have sued "under § 2710 prior to the conclusion of the compact negotiations, if it believed [the state] was not negotiating in good faith," *Wisconsin Winnebago I*, 824 F.Supp. at

172, rather than completing the compact and attempting "an end-run" around it, *Wisconsin Winnebago II*, 22 F.3d at 724. In contrast, North Fork and the State of California have failed to complete a compact. The Tribe is not engaged in any class III gaming activity. Rather, the Tribe has done exactly what the *Wisconsin Winnebago* courts suggested; it has brought suit, alleging bad faith in negotiation by the State, prior to the conclusion of a compact. Neither *Wisconsin Winnebago I* nor *Wisconsin Winnebago II* support the State's argument the may simply refuse to negotiate with the Tribe regarding class III gaming at the Madera parcel.

Accordingly, even assuming the State's letter refusing to negotiate regarding the Madera parcel was an attempt to negotiate rather than a refusal to do so, that attempt would not meet the good faith requirement of § 2710(d)(3)(A).[22]

C. Interactions between the State and North Fork up to and including the referendum.

North Fork contends that by the referendum vote the State failed to negotiate in good faith. North Fork's position is that the good faith negotiation requirement of IGRA applies to the State as a whole – including the people of the State in voting on a referendum. It contends that the people of the State of California failed to negotiate in good faith when they impermissibly considered: (1) whether the gaming was to take place on lands acquired after October 17, 1988, a determination appropriately made by the Governor and Secretary of the Interior;[23] (2) the number of Indian casinos already operating in California; and (3) the lack of education and general fund taxation income to the State as a result approval of the 2012 Compact. The State's position is that the good faith requirement of IGRA can only be satisfied or violated through the Governor's negotiation with the tribe; the referendum vote has no impact on whether the State negotiated in good faith.

---

[22] No part of this Order should be read for the proposition that an Indian tribe may unilaterally insist that a specific plot of Indian land be the only negotiable site for class III gaming activity. Rather, this case is confined by the facts that no other viable location was available to the tribe and the State articulated no § 2710(d)(3)(C) topic or § 2710(d)(7)(B)(iii)(I) purpose in refusing to negotiate over that location.

[23] *See* 25 U.S.C. § 2719(b)(1)(A) (Gaming on land acquired after October 17, 1988 shall not be conducted unless "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.")

A threshold question for this portion of the action is which person(s) or entity(s) owe a duty to negotiate in good faith on behalf of the State with the Tribe. The text of IGRA does not mandate that any particular state entity negotiate with Indian tribes. Section 2710(d)(3)(A) provides, in whole:

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

The duty to negotiate is imposed generally upon the State. The State's position is that the absence of clear direction from Congress as to which specific entity must negotiate with an Indian tribe leaves question to state law. Doc. 21-1 at 15-17 (citing *Pueblo of Santa Ana v. Kelly*, 932 F.Supp. 1284, 1294 (D.N.M. 1996) *aff'd* 104 F.3d 1546, 1558); *see also Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1153 (9th Cir. 2015) (noting that state and federal law govern the process of entering into a gaming compact). The Court agrees that a state may set its own procedure for engaging in negotiations with Indian tribes. In fact, the Supreme Court noted "that the duty … to 'negotiate ... in good faith to enter into' a compact with another sovereign [] stands distinct in that it is not of the sort likely to be performed by an individual state executive officer or even a group of officers." *Seminole*, 517 U.S. at 75, n. 17. That said, the system structured by state law for negotiation – regardless of the name given to each part of the process, whether it be negotiation, ratification, execution, or some other term – all falls within the IGRA requirement that the state negotiate in good faith. A state's use of the term "negotiate" in a fragmented system may be narrower than the duty imposed upon a state by IGRA to engage in good faith negotiation. In such a situation, whether the state-authorized entity did all within its authority to negotiate in good faith is not the dispositive inquiry.

For instance, under the State's framework, a state could designate an official to negotiate and another to approve; so long as the former official negotiates and concludes negotiations in good faith, the latter official can simply reject a compact for any reason – not holding the authority to renegotiate – and the state will have complied with IGRA. Although the state may

structure its compact negotiation process as it sees fit, the state may not carve out additional procedural hurdles that fall outside of or are not subject to IGRA's negotiation requirement; doing so would render the duty to negotiate in good faith toothless. Such a framework is not consistent with the purpose of IGRA. *See* S. Rep. 100-446 at *13-14 ("It is the commission's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from … gaming…. [IGRA] grants a tribe the right to sue a State if compact negotiations are not concluded."); 25 U.S.C. § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."); *see generally* 25 U.S.C. § 2702. In order for the good faith portion of the requirement that a state "negotiate with [an] Indian tribe in good faith to enter into … a compact" to have any significance, the negotiating party must have the authority to bind the state or the approving body must have some predictable standard by which it approves compacts.

Because the Court has already determined that the State's refusal to negotiate triggers the remedial provisions of IGRA, *see* Section IV(B)(1), *supra*, the Court need not come to any determination on this issue.

### V. Conclusion and Order

Based on the foregoing, the Court concludes that the State failed to enter into negotiations with North Fork for the purpose of entering into a Tribal-State compact within the meaning of § 2710. Accordingly, the parties ARE HEREBY ORDERED to conclude a compact within 60 days of the date of this order. *See* 25 U.S.C. § 2710(d)(7)(B)(iii).

IT IS SO ORDERED.

Dated:   November 13, 2015        _____

                                 SENIOR  DISTRICT  JUDGE