1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   THE ESTOM YUMEKA MAIDU TRIBE            No. 2:14-cv-01939-TLN-CKD
     OF THE ENTERPRISE RANCHERIA OF
12   CALIFORNIA,

13                 Plaintiff,               **MEMORANDUM AND ORDER**

14          v.

15   THE STATE OF CALIFORNIA,

16                 Defendant.

17
         The matter is before the Court on cross motions for judgment on the pleadings by Plaintiff
18
     the Estom Yumeka Maidu Tribe (hereinafter "Plaintiff") and Defendant the State of California
19
     (hereinafter "Defendant").  (ECF Nos. 14, 17.)  The Court has carefully considered the factual
20
     and legal issues presented in the parties' filings, and the arguments raised in the amicus brief
21
     submitted by the California legislature (ECF No. 19).  For the reasons discussed below, the Court
22
     GRANTS Plaintiff's motion for judgment on the pleadings, and DENIES Defendant's motion.
23
         **I.  Summary of the Issues**
24
         Under the federal Indian Gaming Regulatory Act ("IGRA"), an Indian tribe seeking to
25
     conduct casino-style gaming on Indian land must request that the state enter into good faith
26
     negotiations to conclude a gaming compact.  25 U.S.C. § 2710(d)(3).  Under California law, the
27
     governor is tasked with negotiating a compact, and the legislature is tasked with ratifying it.  Cal.
28

                                              1

Const., Art. IV, § 19(f).  In this case, Plaintiff negotiated and signed a compact (the "Compact") with Governor Jerry Brown in 2012.  However, the legislature essentially took no further action and did not hold a vote on ratification.  The Compact eventually expired on its own terms in July 2014.

Plaintiff's immediate remedy under the IGRA is to bring suit.  After Plaintiff has introduced evidence that the state has not negotiated toward a compact in good faith, it is the state's burden to show it has negotiated in good faith.  Otherwise, the state is subject to a court order compelling it to conclude a compact within 60 days, with additional remedies should the state continue to reject the compact.  25 U.S.C. § 2710(d)(7)(B).

Defendant's position is that the legislature's inaction cannot form the basis for suit under the IGRA, because only the governor negotiated the instant Compact.  Plaintiff's position is that the IGRA's negotiation mandate extends to activities by the legislature.  Both parties have moved for judgment on the pleadings on the issue of whether Defendant has negotiated the instant Compact in good faith, and thus whether Plaintiff is entitled to relief under the IGRA.

**II.  Facts and Statutory Background**[1]

A.  <u>Department of Interior's trust acquisition and gaming determination</u>

Plaintiff was federally recognized as a sovereign Indian tribe in 1915.  According to Plaintiff, during the 20th century it exercised jurisdiction over two parcels of land, both 40 acre parcels located near the former town of Enterprise in Northern California.  Plaintiff still exercises jurisdiction over one of those parcels which apparently is unsuitable for building.  The other parcel was transferred to the State of California in 1965 via Congressional Act, Public Law 88–

---

[1]     For convenience, the Court has cited mostly to Plaintiff's complaint in this section.  The factual background recited by both parties, relative to tribal history, negotiations with the governor, and transmission of the Compact to the legislature, appears generally undisputed.  For more context regarding the legislature's activity, the Court cites in Section IV(c) to the amicus brief filed by the California legislature.

Plaintiff filed the complaint in this matter on August 20, 2014.  Defendant answered on October 15, 2014.  (ECF No. 11.)  Plaintiff moved for judgment on the pleadings on January 12, 2015, and Defendant moved for judgment on the pleadings on February 12, 2015.  (ECF Nos. 14, 17.)  The California legislature (via legislative counsel) filed an amicus brief in support of Defendant, on March 5, 2015.  (ECF No. 19.)  The parties have filed additional reply briefs.  (ECF Nos. 20, 21, 23.)  Plaintiff submitted a notice of supplemental authority on December 18, 2015, discussed *infra*, and Defendant and Legislative Counsel have filed responses to that notice.  (ECF Nos. 24, 25, 26.)

453.  (Compl. ¶¶ 25–28.)

In 2002, Plaintiff submitted a fee-to-trust application to the Secretary of the Interior (the "Secretary"), seeking to have an additional 40 acres of land in Yuba County taken into trust on its behalf.  *See* 25 U.S.C. § 465 ("The Secretary of the Interior is authorized, in his discretion, to acquire … any interest in lands … for the purpose of providing land for Indians").  In 2006, Plaintiff supplemented its application with a request that the Secretary also find the parcel gaming-eligible.  *See* 25 U.S.C. § 2719(b)(1)(A) (providing that the Secretary may find a gaming establishment to be "in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination").  (Compl. ¶¶ 31–32.)

On September 1, 2011, the Secretary determined the parcel to be gaming-eligible, and on August 30, 2012, Governor Jerry Brown concurred.  On May 15, 2013, the Department of the Interior took the parcel into trust on behalf of Plaintiff for the purpose of gaming.  (Compl. ¶¶ 34–36.)

B.  Class III gaming compacts

While proceedings relative to trust acquisition and gaming-eligibility were ongoing, Plaintiff also sought to negotiate a gaming compact with California regarding a class III gaming facility.  Class III gaming includes casino-style gaming such as card games played against the house and slot machines.[2]  25 U.S.C. § 2703(6)–(8); *N. Cty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009).

Class III gaming on Indian lands may occur if permitted by state law and if conducted in in accordance with a tribal-state gaming compact.  25 U.S.C. § 2710(d)(1)(B) and (C).  A tribe intending to conduct class III gaming shall request that the state "enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.  Upon

---

[2]      Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming ... in connection with tribal ceremonies or celebrations."  Class II gaming includes bingo and card games that are explicitly authorized or not explicitly prohibited by the State.  Class III gaming is defined as all gaming that is not class I or II.  25 U.S.C. § 2703(6)–(8).

1  receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into

2  such a compact."  25 U.S.C. § 2710 (d)(3)(A).

3       In March 2000, California voters ratified Proposition 1A, which permitted certain class III

4  gaming only on Indian lands.  *See In re Indian Gaming Related Cases*, 331 F.3d 1094, 1103,

5  1107 (9th Cir. 2003); *Rincon Band of Luiseno Mission Indians of Rincon Reservation v.*

6  *Schwarzenegger*, 602 F.3d 1019, 1023 (9th Cir. 2010) ("Not only did Proposition 1A permit

7  tribes to conduct class III gaming lawfully, it effectively gave tribes a state constitutional

8  monopoly over casino gaming in California").  The same referendum also established a two-part

9  procedure for negotiating and ratifying gaming compacts.  Under this procedure, "the Governor is

10  authorized to negotiate and conclude compacts, subject to ratification by the Legislature."  Cal.

11  Const., Art. IV, § 19(f).[3]

12       This procedure is also codified in Cal. Gov. Code § 12012.25(c) and (d), which provides

13  that compacts "shall be ratified by a statute approved by each house of the Legislature," while

14  "the Governor is the designated state officer responsible for negotiating and executing, on behalf

15  of the state, tribal-state gaming compacts …."

16       C.  Compact negotiations

17       According to Plaintiff, in June 2000, it sent California a request to begin compact

18  negotiations.  Plaintiff sent an additional request in 2004. California initially rejected these

19  requests, although Plaintiff continued to meet to discuss a proposed gaming facility with the

20  legislative staff of Governor Schwarzenegger and, beginning in 2011, a senior advisor to

21  Governor Jerry Brown.  (Compl. ¶ 40.)

22       In August 2012, compact negotiations "began in earnest," relative to the Secretary's

23  September 1, 2011, determination that the parcel to be taken into trust was gaming eligible under

24  [3]  Cal. Const., Art. IV, § 19(f) states:

25      [T]he Governor is authorized to negotiate and conclude compacts, subject to

26      ratification by the Legislature, for the operation of slot machines and for the
    conduct of lottery games and banking and percentage card games by federally

27      recognized Indian tribes on Indian lands in California in accordance with federal
    law. Accordingly, slot machines, lottery games, and banking and percentage card

28      games are hereby permitted to be conducted and operated on tribal lands subject
    to those compacts.

25 U.S.C. § 2719(b)(1)(A).  (Compl. ¶ 41.)  Plaintiff submits that "the Governor indicated that he was giving serious consideration to concurring in the Secretary's [] determination, but only if the Tribe would first agree to negotiate and enter into a tribal-state compact that provided the State and its residents with the same or similar protections as other compacts in California."  (Compl. ¶ 41.)

After further negotiation, including acceptance by Plaintiff of provisions found in other compacts which the legislature had ratified, Plaintiff and the governor signed the instant Compact on August 30, 2012.[4]  On the same date, the governor concurred in the Secretary's determination that the Yuba parcel was gaming eligible under § 2719(b)(1)(A).  (Compl. ¶¶ 42, 48.)

Shortly after the Compact was signed it was transmitted from the governor's office to the California legislature.  After the parcel of land was taken into trust in May, 2013, Plaintiff informed the governor's office and members of the legislature, and requested that the Compact be ratified.   The legislature took no activity to ratify the Compact during the 2013 session.  (Compl. ¶ 50.)

Throughout the first half of 2014, Plaintiff engaged in a "concerted effort" with the governor's office to secure ratification in the legislature.  (Compl. ¶ 51.)  In May, 2014, Assemblyman Adam Gray introduced AB 1098, to ratify the Compact but according to Plaintiff, the legislature "held neither an information hearing nor a vote" on that bill, and the Compact was not ratified.  (Compl. ¶ 51.)  The Compact expired by its own terms on July 1, 2014.  (Compl. ¶ 53.)  The parties appear to agree, with some qualifications noted *infra*, that the legislature has taken no action on the Compact.[5]

---

[4]	According to Plaintiff, those provisions included "procedures for the reporting and auditing of revenues from class III gaming devices; licensing of the gaming facility, employees, resource suppliers, and financial sources; approval and testing of gaming devices; inspection and access to the gaming facility; operation and management of the gaming operation; resolution and arbitration of patron disputes, tort claims, and employee discrimination claims; environmental review and off-reservation mitigation of defined project activities; and resolution of compact disputes."  (Compl. ¶ 42.)

[5]	*See* Answer, ECF No. 11 ¶ 61 ("[T]he State admits that no further negotiation of the terms of the Enterprise Compact has occurred since the Enterprise Compact was transmitted to the California State Legislature"); Def.'s MJP, ECF No. 17-1 at 5, 9 ("Although the Governor timely submitted the Enterprise Compact to the California legislature for ratification, the Legislature did not act on his request and the compact eventually expired by its own terms"; "In order for Plaintiff to prevail in this case, the Court would have to find that the Legislature's failure to take any action to ratify the Enterprise Compact constituted bad faith negotiations under the IGRA").  A fuller account of

D. Remedy under the IGRA

Based on the legislature's inaction, Plaintiff seeks redress under 25 U.S.C. § 2710(d)(7). Under this scheme, 180 days after a tribe requests the opening of compact negotiations with the state, the tribe may bring suit arising from the state's failure to enter into a compact or to negotiate in good faith.  If the tribe then produces evidence that a compact was never entered into and the state did not respond to the tribe's request to negotiate in good faith, the burden is on the state to prove that it has in fact negotiated with the tribe in good faith to conclude a compact.  25 U.S.C. § 2710(d)(7)(A) and (B).

If the court still finds the state has failed to negotiate a compact in good faith, the court must order the state and the tribe to conclude a compact within 60 days.  If no compact is concluded, the court appoints a mediator to select from the compacts proposed by the tribe and the state.  The state then has 60 additional days to consent to that selected compact.  If the state does not consent, the Secretary of the Interior prescribes the procedures under which class III gaming may occur.  25 U.S.C. § 2710(d)(7)(B)(iii)–(vii).

**III.  Legal Standard**

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy."  *Pit River Tribe v. Bureau of Land Management*, 793 F.3d 1147, 1155 (9th Cir. 2015) (citing *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012)).  As to a defendant's motion, judgment on the pleadings is appropriate when, even if all allegations in the complaint are true, the defendant is entitled to judgment as a matter of law.  *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).  As to a plaintiff's motion, similarly, judgment is appropriate when, assuming the truth of the factual allegations, the plaintiff is entitled to judgment as a matter of law.  Judgment may properly be granted only if "there is no issue of

---

the specific activity undertaken by the legislature, and context for that activity, is offered below in Section IV(c).

material fact in dispute." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). *See North Fork Rancheria of Mono Indians of California v. State of California*, No. 1:15-cv-00419-AWI-SAB, at *7–8 (E.D. Cal. Nov. 13, 2015).

## IV.  Analysis

As an initial matter, it does not appear the parties dispute material facts that would preclude judgment on the pleadings.  The parties, and legislative counsel on behalf of the California legislature, have offered different accounts on the thoroughness of the instant tribal-state negotiations and how the legislature ordinarily considers a bill.  However, clearly the parties would like this Court to make a decision on the legal issue of whether the legislature's inactivity is covered by the IGRA's good faith negotiation mandate.

The Court takes the parties' moving papers to raise four main issues: Defendant's immunity (or waiver thereof) under the Eleventh Amendment; the implications under the Tenth Amendment of subjecting the legislature to the IGRA's negotiation mandate; whether Plaintiff has fulfilled the prerequisites under IGRA for putting the state to its burden of showing it has negotiated in good faith; and whether the legislature's inactivity actually constitutes a lack of good faith under the IGRA.  The Court therefore turns to each of these issues.

### A.  Eleventh Amendment immunity

In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court held that the Eleventh Amendment prevents Congress from authorizing suits by Indian tribes against states under the IGRA.  The IGRA "cannot grant jurisdiction over a State that does not consent to be sued." *Id.* at 47.  In some circumstances, California has consented to suit under the IGRA.  Cal. Gov. Code § 98005 provides in relevant part:

> [T]he State of California also submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith … or the state's violation of the terms of any Tribal-State compact to which the state is or may become a party.

Defendant argues that the legislature's lack of activity regarding a governor-negotiated compact

does not fall within this waiver of immunity.  Defendant argues: "[t]he waiver in Government Code section 98005 thus applies only to suits based on the Governor's failure to either enter into negotiations, or failure to negotiate in good faith.  There is no support for the idea that the waiver extends to suits based on the Legislature's failure to ratify a compact."  (ECF No. 17-1 at 14.) For the reasons stated below, this Court does not agree with Defendant's argument.

First, the Court notes a similar argument was recently rejected by a court in this District. *See North Fork Rancheria of Mono Indians of California v. State of California*, No. 1:15-cv-00419-AWI-SAB, ECF No. 25 (E.D. Cal. Nov. 13, 2015) (Ishii, J.). In *North Fork*, the governor initially approved a gaming compact with the tribe and the legislature ratified it, but the compact was overturned by a popular referendum.  Thereafter, the state refused to enter into negotiations regarding a new compact.  Judgment in *North Fork* was entered in favor of the tribe, and the parties were ordered to conclude a compact within 60 days, per the same remedial provision Plaintiff seeks in the instant case, 25 U.S.C. § 2710(d)(7)(B)(iii).  Relative to the Eleventh Amendment, the *North Fork* court characterized the state's argument as: "because [plaintiff] North Fork alleges that the state as a whole – rather than the Governor – has failed to negotiate, the Court lacks jurisdiction over the portion of this action that relat[es] to conduct by actors other than the Governor."  *North Fork* at * 9.  The court rejected that argument.  Factual differences aside, this Court agrees with the reasoning in *North Fork*.

As an overriding matter, the language of California's waiver of immunity appears to be crafted to fit the IGRA's grant of jurisdiction to federal district courts over failures in compact negotiations.  Compare Cal. Gov. Code § 98005, *supra*, with the IGRA: "The United States district courts shall have jurisdiction over – (i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact ... or to conduct such negotiations in good faith...."  25 U.S.C. § 2710(d)(7)(A)(i).  The instant lawsuit fits within the plain language of California's waiver, because it arises from "the state's refusal to enter into negotiations … or to conduct those negotiations in good faith … or the state's violation of the terms of any Tribal-State compact to which the state is or may become a party."  Cal. Gov. Code § 98005.

Further, the full text of § 98005 refers to both the "Governor" and the "State of California", indicating that if the California legislature had wanted to restrict suits only to those involving conduct by the governor, it could have done so.  *North Fork* at *11.  Elsewhere in the IGRA, a state's governor is referred to specifically as the relevant entity.  25 U.S.C. § 2719(b)(1)(A) provides that gaming may occur on lands acquired after the IGRA's enactment, if the "Governor of the State" concurs with the Secretary of the Interior that gaming is in the best interest of a tribe and is not detrimental to the community.  Therefore, both California's gaming law and the IGRA acknowledge a distinction amongst state actors, but did not make that distinction relative to a state's immunity from suit.[6]

The *North Fork* court also noted that the two California statutory provisions giving the Governor the exclusive authority to negotiate IGRA compacts – Cal. Const. Art. IV, § 19; Cal. Gov. Code § 12012.25(c) and (d) – were not enacted until after California had already enacted its waiver of sovereign immunity in § 98005.  *See* 1999 Cal. Legis. Serv. Res. Ch. 142 (S.C.A. 11); 1999 Cal. Legis. Serv. Ch. 874 (A.B. 1385).  Both Cal. Gov. Code § 98005 and § 98002 were enacted as part of the Tribal Government Gaming and Economic Self-Sufficiency Act of 1998. Section 98002, along with all provisions of that Act except for the relevant portion of § 98005, were eventually found unconstitutional by the California Supreme Court.  *See Hotel Employees & Rest. Employees Int.'l Union v. Davis*, 21 Cal. 4th 585 (1999).  However, Section 98002 required the governor to enter into IGRA compact negotiations *and* "reach agreement and execute that compact on behalf of the state."  With some limitations, such as expanding the scope of class III gaming in California, the governor's authority under § 98002 did "not require action by the Legislature."  Cal. Gov. Code § 98002.  Therefore, despite the fact that the governor was tasked with negotiating *and* executing a gaming compact subject to the IGRA, at the time the § 98005

---

[6]      Plaintiff also directs the Court to a decision from the Arizona Supreme Court, *Salt River Pima-Maricopa Indian Cmty v. Hull*, 945 P.2d 818 (Ariz. 1997) (en banc), which held that the IGRA's negotiation mandate extends to the State as a whole, not just the governor.  *See id.* at 822 ("The essence of the Governor's argument is that IGRA requires negotiation with Indian tribes on a case-by-case basis for the terms of gaming compacts covering reservation land. We agree, but note IGRA confers no powers or privileges on the governor as such. The federal statute requires only that 'the *State* shall negotiate' and permits any '*State* and any Indian tribe' to enter into a 'Tribal-*State* compact governing gaming...'").

1   waiver of immunity was enacted, § 98005 still did not refer specifically to the governor and

2   instead authorized suit against the "State" relative to an IGRA compact.[7]  *See North Fork* at *10–

3   11.

4       Defendant has not submitted either state or federal case authority in support of the

5   position that if activity by the legislature constitutes the alleged offense conduct, then the § 98005

6   waiver no longer applies.  The relevant language of § 98005 quoted above refers only to the state,

7   and not a more specific entity.  For the above reasons, the Court finds Defendant is not immune

8   from suit under the Eleventh Amendment.

9       B.  Tenth Amendment sovereignty

10      Defendant also contends that subjecting the California legislature to the IGRA's

11  negotiation mandate would invade a fundamental aspect of Defendant's sovereignty, which is

12  prohibited by the Tenth Amendment.  Defendant argues that "the Federal Government may not

13  compel the States to implement, by legislation or executive action, federal regulatory programs,"

14  *Printz v. United States*, 521 U.S. 898, 925 (1997).

15      Plaintiff's position is that the IGRA's compacting requirement does not compel Defendant

16  to implement a federal program.  In part, this is due to the fact that Defendant need not permit

17  class III gaming in the first place.  25 U.S.C. § 2710(d)(1)(B).  California has elected to do so.

18  Further, Defendant is not under a duty to negotiate.  It may refuse to do so, which ultimately leads

19  to gaming conditions determined by the Secretary of the Interior.

20      It should be noted that while the IGRA preempts state regulation of class III gaming, it

21  does extend to Defendant a role in the regulatory process by providing for a tribal-state compact.

22  As stated in the August 13, 1988 Senate Report on the IGRA:

23          The mechanism for facilitating the unusual relationship in which a
            tribe might affirmatively seek the extension of State jurisdiction and
24          the application of state laws to activities conducted on Indian land
            is a tribal-State compact.   In no instance, does [the IGRA]
25          contemplate the extension of State jurisdiction or the application of
            State laws for any other purpose.
26

----

27  [7]   This is the Court's understanding of the timeline underlying § 98002 and § 98005; Cal. Const., Art. IV., §
    19(f); and Cal. Gov. Code § 12012.25(c) and (d).  The parties have not briefed this issue, although in their
    supplementary briefing regarding the *North Fork* decision, they do not identify error in the court's analysis on this
28  point.

…

> It is also true that [the IGRA] does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact … This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives, while at the same time, work together to develop a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied.

…

> [The IGRA] is intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed.

S. REP. 100-446, 6, 1988 U.S.C.C.A.N. 3071, 3075–76.

The IGRA's preemptive effect is consistent with the plenary power afforded to the federal government over Indian affairs.  *See Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 376 n. 2 (1976) (Congress has "plenary and exclusive power ... to deal with Indian tribes"); *Morton v. Mancari,* 417 U.S. 535, 551–52 (1974) (plenary power is "drawn both explicitly and implicitly" from the Indian Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, and the President's treaty power, U.S. Const. Art. II, § 2, cl. 2); *United States v. Sioux Nation of Indians,* 448 U.S. 371, 413 (1980) (citing *Lone Wolf v. Hitchcock,* 187 U.S. 553, 565 (1903)) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning ...").  As such, Plaintiff's position that Defendant's power to regulate Class III gaming "derive[s] not from the reserved powers of state sovereignty, but rather from the delegated powers of national sovereignty," is supported.  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995).

Defendant refers to *Printz*, *supra*, which considered the constitutionality of the Brady Handgun Violence Prevention Act under the Tenth Amendment.  That Act required chief law enforcement officers at the local level to conduct background checks and perform related tasks on an interim basis until the national system for doing so became operative.  The Supreme Court held that violated the Tenth Amendment because it effectively permitted the federal government to "impress into its service – and at no cost to itself – the police officers of the 50 states," a power

ordinarily reserved for the states.  *Printz*, 521 U.S. at 922.  *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 24–25 (1905).  By contrast, here "the Congressional intent and purpose of IGRA as a whole emphasize that the relationship between the State and the Tribes is that of two sovereign entities cooperating to reconcile potentially competing interests, but remaining subject to federal regulation and authority."  *Rumsey Indian Rancheria of Wintun Indians, Table Mountain Rancheria v. Wilson,* No. CIV-S-92-812 GEB, 1993 WL 360652, at *11 (E.D. Cal. July 20, 1993).

   This is particularly so, in light of the fact that Defendant is not required to permit class III gaming in the first place.  If a state does permit class III gaming, it is not required to negotiate with a tribe to conclude a compact, in the sense that there is no ultimate mandate that a tribal-state be agreed upon.  As the Tenth Circuit reasoned: "IGRA's directive to the states to conclude a compact must be read in the context of the sections that immediately follow in § 2710(d)(7), which contemplate that a state and tribe may fail to agree to a compact.  In that event, the states are not required to do anything further, and instead the Secretary of the Interior takes over.  Had Congress intended to mandate that the states enter into compacts with Indian tribes, it would not have included these latter sections in § 2710(d)(7)."  *Ponca Tribe of Oklahoma v. State of Oklahoma*, 37 F.3d 1422, 1435 (10th Cir. 1994).  *See id.* at 1433–1434 (referencing *New York*, 112 S. Ct. 2408, 2420–24 (1992) (Congress "may direct a state to consider implementing a federal program so long as the states retain the prerogative to decline Congress' invitation"); *Cheyenne River Sioux Tribe v. State of S.D.*, 3 F.3d 273, 281 (8th Cir. 1993) (internal quotation marks omitted) ("We agree with the district court that the IGRA gives states the right to get involved in negotiating a gaming compact because of the obvious state interest in gaming casino operations within the state boundaries, but does not compel it").[8]

_____

[8]    *See also Kentucky Division, Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1415–16 (6th Cir. 1994).  At issue in *Turfway* was the Interstate Horseracing Act, which provided that a race facility had to obtain the state's consent to participate in interstate wagering.  The state argued this violated the Tenth Amendment, because it required the state to exercise its regulatory authority in either granting or denying a facility's request.  The Sixth Circuit held there was no constitutional problem, however, because the Act did "not require a State to do *anything* when presented with a request for its consent to off-track betting.  Under the Act, the State remains free to ignore such a request.  It is true that the State's inaction will preserve the general federal prohibition of interstate off-tracking betting … but that effect does not amount to 'regulation'…."  *Id.* at 1415.

The Ninth Circuit has acknowledged the multiple interests balanced by the IGRA, and has even characterized the state's role under as the IGRA as an "obligation". *See In re Indian Gaming Related Cases*, 331 F.3d at 1096 (citing *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (2002)) ("IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme"); *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1030 (9th Cir. 2010) ("In IGRA, Congress took from Plaintiffs collectively whatever sovereign rights they might have had to engage in unregulated gaming activities, but imposed on the states the obligation to work with tribes to reach an agreement under the terms of IGRA permitting Plaintiffs to engage in lawful class III gaming activities").  Based on the foregoing, the Court finds that subjecting the California legislature to the IGRA's negotiation provision would not invade a fundamental aspect of Defendant's sovereignty, thereby violating the Tenth Amendment.

Importantly, the foregoing is not at odds with the fact that Defendant may determine the procedure by which a compact is negotiated and entered into.  *See North Fork* at *22; *Tulalip Tribes of Washington v. Washington*, 787 F.3d 1151, 1153 (9th Cir. 2015); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997) ("IGRA says nothing specific about how we determine whether a state and tribe have entered into a valid compact. State law must determine whether a state has validly bound itself to a compact").  The Court does not find – and Plaintiff does not appear to argue for – an inherent problem with the two-step process of negotiation and ratification enacted under California law.  If that is the process by which Defendant wants to negotiate and enter into gaming compacts, it appears that California may do so.  On this issue, Plaintiff directs the Court to *Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993), which is on point.  In *Biggs*, the California Department of Transportation paid late wages because a state budget had not been passed, and thus no funds appropriated for that purpose.  That, however, violated minimum wage provisions of the federal Fair Labor Standards Act ("FLSA").  *Id.* at 1538.  The state argued that applying the FLSA would "require California to pass a budget on time, a [] serious infringement of state sovereignty."  *Id.* at 1543.  The Ninth Circuit found that argument

13

1   unavailing:

> [W]e nevertheless find that the application of the FLSA is not preempted by the Tenth Amendment. To the extent compliance with the FLSA interferes with the state budgetary process, that interference is caused by state law, not federal law. The FLSA does not require California to pass a budget on time; it only requires California to do what all employers must do-pay its employees the minimum wage on payday. That California has made its federal obligation dependent upon the operation of state law does not render the federal law unconstitutional.

*Id.* at 1543.

In the same vein, as the *North Fork* court reasoned, the IGRA defines negotiation broadly as an activity between Plaintiff and Defendant. California may then specify which intra-state entity does the negotiation, but that state-created definition is not what the Court looks to in determining whether negotiation, per the IGRA, has been conducted in good faith. *North Fork* at *22. The Court is bound to evaluate negotiation as described in the broad sense under the IGRA, which refers only to the state, not the governor or the legislature.

As a further reference point, Plaintiff submits and it appears to be the case that in Arizona, the governor alone "may enter into negotiations and execute tribal-state compacts" for class III gaming. A.R.S. § 5-601. Were a scenario to exist in which the Arizona governor negotiated a gaming compact, but then refused to take further action on it for nearly two years, surely that would suggest a violation of the IGRA's good faith negotiation mandate. That is the scenario in this case, except California has divided the authority for negotiating and ratifying the compact between two entities. The Court does not view the fact that Defendant, under state law, has elected to enter into a compact in this manner to be grounds for a violation of Defendant's state sovereignty under the Tenth Amendment.

C. California legislature's activity

The parties do not appear to dispute that, standing alone, the governor and Plaintiff's negotiations were conducted in good faith prior to the Compact being sent to the legislature. Plaintiff has filed the Compact with the Court, and explained some of the key points of negotiation leading to that agreement. (ECF No. 1-2, Ex. E; Compl. ¶¶ 40–48.) In this lawsuit, Defendant has not identified any specific provisions in the Compact which are objectionable.

14

1    Rather, the issue is whether the legislature's inaction constitutes a breach of Defendant's good

2    faith negotiation mandate.

3           Based on the parties' filings, the Court takes Defendant's activity after the Compact was

4    signed, to be as follows: After the Compact was signed in August, 2012, it was transmitted from

5    the governor's office to the legislature.  After the Yuba parcel was taken into trust, in May, 2013,

6    Plaintiff informed the governor's office and members of the legislature of this development, and

7    requested that the Compact be ratified.  No action was taken by the legislature during the 2013

8    session.  Throughout the first half of 2014, Plaintiff engaged in a "concerted effort" with the

9    governor's office to secure ratification.  (Compl. ¶¶ 49–51.)

10          According to legislative counsel's amicus brief, after the legislature accepted the Compact

11   from the governor, the California Senate sought input from stakeholders in an effort to better

12   understand the impact of gaming compacts, including the instant Compact, on Defendant.[9]  On

13   May 27, 2014, the Compact was amended into AB 1098, and a day later was referred to the

14   Senate Committee on Rules.  AB 1098 was permitted to remain with the Committee on Rules,

15   which is "a decision consistent with internal legislative rules permitting the Rules Committee of

16   each house to refer bills to a policy committee, or to retain the bill as the Committee sees fit."[10]

17   (ECF No. 19 at 5.)  Legislative counsel clarifies that only a small percentage of the thousands of

18   bills introduced each year are actually taken up for a vote.  There is no legislative rule compelling

19   the houses to ratify a compact within a certain period of time.  Some bills are reintroduced from

20   one legislative session to another.  Legislative counsel also appears to indicate that all tribal-state

21   compacts transmitted to the legislature over the past fifteen years were eventually ratified.  (ECF

22   No. 19 at 5–6.)

23          Plaintiff has also filed a copy of a July, 2013, letter to the governor from California

24   Senator Kevin de Leòn.  (ECF No. 1-2, Ex. G.)  Senator Leòn related that the senate was creating

25   a working group to examine gaming compacts which permitted tribes to operate casinos on non-

26   reservation lands.   He expressed a concern specifically relative to the compact which was the

---

27   [9]      Legislative Counsel does not further elaborate.

28   [10]     See Assembly Rule 14(a), Senate Rule 13(g).

1    subject of the *North Fork* litigation, which had been signed by the governor and ratified by the

2    legislature.  He requested that the governor not submit such gaming compacts to the legislature

3    for ratification, until the working group had "completed its ratification and California ha[d]

4    adopted a clear and coherent policy on off-reservation gaming."  (ECF No. 1-2, Ex. G at 277.)

5         Plaintiff has also filed with this Court a *Los Angeles Times* article from August, 2013,

6    reporting that Senator de Leòn wanted the governor to delay submitting the instant Compact for

7    legislative approval.  (ECF No. 1-2, Ex. H.)  Plaintiff avers that the governor was aware of the

8    legislature's intent, but nonetheless intended to work toward ratification.  (Compl. ¶ 54.)

9         In summary, the Compact was submitted to the legislature shortly after signature by the

10   governor and Plaintiff in August, 2012.  The Compact was eventually amended into a bill and

11   referred to the Senate Committee on Rules, in May, 2014.  Thereafter, no action on the Compact

12   took place.  The Compact expired by its own terms on July 1, 2014.  Thus, nearly two years

13   passed since the Compact was signed and submitted to the legislature before the Compact

14   expired.  The parties have not noticed the Court of any new activity taking place in the legislature

15   with respect to the Compact or a new compact.  Thus, as of entry of this order, over three years

16   have passed since the Compact was signed and transmitted to the legislature.  The issue is

17   whether this activity by Defendant constitutes a breach of the IGRA's mandate that Defendant

18   negotiate in good faith to conclude a compact.

19        D.  180-day period

20        An Indian tribe may initiate a cause of action arising from the state's failure to enter into a

21   compact or to conduct good faith negotiations, only after the close of a 180-day period beginning

22   on the day on which the request was made to enter into negotiations.  25 U.S.C. § 2710(d)(3)A)

23   and (7)(A)–(B).  It has been over 180 days since Plaintiff's negotiations with the governor "began

24   in earnest" in August, 2012.  (Compl. ¶ 41.)  After the parcel of land was taken into trust in May,

25   2013, Plaintiff informed the governor's office and members of the legislature, and requested that

26   the Compact be ratified.  The legislature took no activity to ratify the Compact during the 2013

27   session.  (Compl. ¶ 50.)  Throughout the first half of 2014, Plaintiff engaged in a "concerted

28   effort" with the governor's office to secure ratification in the legislature.  (Compl. ¶ 51.)

Although the filings with this Court indicate that Plaintiff sent a request to begin compact negotiations with the governor as far back as 2000, the Court finds that, at minimum, the negotiations that occurred in August, 2012 establish that the 180-day requirement under 25 U.S.C. § 2710(d)(3)A) and (7)(A)–(B) is met.

Defendant argues that Plaintiff – prior to filing suit – must request that Defendant again enter into negotiations.  Then if good faith negotiations do not occur a second time, Plaintiff may file suit.  Defendant does not provide any legal authority in support of this argument.  However, Plaintiff made several requests during the terms of at least three governors to negotiate a compact, some of which were rejected.  According to Plaintiff after negotiations began in 2012, "the Governor indicated that he was giving serious consideration to concurring in the Secretary's [] determination, but only if the Tribe would first agree to negotiate and enter into a tribal-state compact that provided the State and its residents with the same or similar protections as other compacts in California."  (Compl. ¶ 41.)  After further negotiation, including acceptance by Plaintiff of provisions found in other compacts which the legislature had ratified, Plaintiff and the governor signed the instant Compact on August 30, 2012.  It is undisputed that those negotiations were conducted in good faith and resulted in the Compact being signed in August, 2012.  Thus, the request by Plaintiff to enter into good faith negotiations was actually honored.  After the Compact was signed, in May of 2013, Plaintiff informed the governor and the legislature that the land had been taken into trust and requested that the compact be ratified.  The instant lawsuit does not arise from the failure of Defendant to enter into compact negotiations or conduct those negotiations in good faith.  Essentially, Defendant's argument would require that the request for negotiations under the IGRA, for purposes of suit, be called for at multiple stages of the process depending on where a hold-up in negotiations occurred.

For example, in *North Fork*, a compact was signed by the governor, ratified by the legislature, and noticed to the Secretary of the Interior who approved it.  Subsequently, a popular referendum overturned the Compact.  At that point, Plaintiff requested again for further negotiations with the state in order to conclude the compact.  After the state refused, Plaintiff

1    brought suit.[11]  *North Fork* at 5, 13–14.  It appears Defendant argues a similar step should occur

2    here: due to the legislature's inactivity, Plaintiff should again request that Defendant negotiate in

3    good faith.

4         As an initial matter, Plaintiff submits and Defendant has not disputed, that Plaintiff

5    conducted negotiations with the governor's office to secure ratification, after the Compact had

6    been signed and transmitted to the legislature.  (Compl. ¶ 51.)  In *North Fork*, the compact had

7    already been concluded in the sense Plaintiff seeks here, which is legislative ratification,

8    presumably followed by notice to the Secretary of the Interior.  25 U.S.C. §2710(d)(8).  As an

9    overriding matter, however, Defendant does not identify authority holding that the state-created

10   process – negotiation by the governor and ratification by the legislature – is not subject to the

11   IGRA's plain statement that Plaintiff may bring suit if 180 days have passed since Plaintiff

12   requested negotiations.  The IGRA provides that upon request the "State" shall enter into good

13   faith negotiations over a compact, and permits suit after 180 days arising from the "failure of a

14   State" to do so.  25 U.S.C. §2710(d)(3)A) and (7)(A)–(B).  Defendant does not cite to authority

15   holding that IGRA requires additional requests depending on the stage at which compact

16   negotiations with the state are stalled or otherwise halted.  Further, it appears the course of events

17   in this case are: negotiation with the governor in 2012; the signing of the Compact and

18   transmission to the legislature; and the eventual expiration of the Compact.  Nothing like the

19   disruptive event at issue in *North Fork* – overturning the compact by referendum vote after it had

20   already been concluded for the purposes of IGRA – is suggested by the parties here.[12]

21        E.  Good faith negotiation under the IGRA

22        After a tribe brings suit, it must then introduce evidence that a "compact has not been

23   entered into" and "the State did not respond to the request of the Indian tribe to negotiate such a

_____

25   [11]    *North Fork* states that the validity of the referendum and compact is the subject of litigation now pending
26   before the California Fifth District Court of Appeal.  *See Stand Up for California v. State of California et al*., 5th
     DCA Case No. F070327, filed Dec. 27, 2014; *North Fork* at 5.

27   [12]    The Court discusses briefly below Plaintiff's suggestion that the Legislature did not want to consider
     compacts involving non-reservation gaming.

28

1    compact or did not respond to such request in good faith." 25 U.S.C. § 2710(d)(7)(B)(ii).  No

2    compact has been entered into.  The legislature's nearly two years of inactivity regarding the

3    Compact until it expired, and no activity since then, constitute evidence that Defendant has not

4    responded in good faith to requests to negotiate.

5          After the introduction of such evidence, the "burden of proof shall be on the State to prove

6    that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact

7    governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii).  Therefore, the Court

8    turns to whether Defendant has met its burden.

9          "The structure and content of § 2710(d) make clear that the function of the good faith

10   requirement and judicial remedy is to permit Plaintiff to process gaming arrangements on an

11   expedited basis, not to embroil the parties in litigation over their subjective motivations. We

12   therefore hold that good faith should be evaluated objectively based on the record of negotiations

13   …." *Rincon*, 602 F.3d at 1041.  Plaintiff also relies upon cases in the National Labor Relations

14   Act ("NLRA") context as the standard for what constitutes good faith negotiation.  Courts

15   considering IGRA have looked to guidance from NLRA case law, because both IGRA and the

16   NLRA contain obligations to negotiate in good faith. *See* NLRA § 8(d), 29 U.S.C. § 158(d);[13]

17   *Big Lagoon Rancheria v. California*, 700 F. Supp. 2d 1169, 1178–79 (N.D. Cal. 2010); *In re*

18   *Indian Gaming Related Cases*, 147 F. Supp. 1001, 1020–21 (N.D. Cal. 2001).  Relying on this

19   precedent, Plaintiff argues that good faith is lacking if: 1) an agreement is negotiated but given no

20   practical effect via approval by an authority not present during the negotiations, 2) there is undue

21   delay, 3) or a party declines to negotiate and at the same time refuses to articulate any concerns

22   with a proposed agreement.  As a standing objection to all three arguments, Defendant argues that

23   the instant case simply is not analogous to the labor law context.  The Court agrees with the

24   Northern District that it "does not intend to import federal case law interpreting the NLRA

25   wholesale into its interpretation of the IGRA. Obviously, the relationship of employers to unions

26   is not analogous to the relationship between states and tribes. However, the Court considers the

27   [13]    "[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours,

28   and other terms and conditions of employment, or the negotiation of an agreement…." 29 U.S.C. § 158(d).

1   NLRA case law for guidance in interpreting a standard undefined by the IGRA." *In re Indian*

2   *Gaming Related Cases*, 147 F. Supp. 2d at 1021.  Moreover, the three principles stated above are

3   generic, and not unique either to IGRA or NLRA.  The Court turns to each of these three

4   principles.

5         First, Plaintiff argues that bad faith is present because the entity with ultimate approval

6   authority (the legislature) is not present at the negotiations and then refuses to approve a

7   negotiated compact.  *See e.g. H.J. Heinz Co. v. NLRB,* 311 U.S. 514, 526 (1941).  Defendant

8   responds that the NLRB standard proposed by Plaintiff would eliminate the legislature's ability to

9   decline to ratify a compact.  Defendant also argues that curtailing the legislature's role would

10  violate Defendant's sovereign immunity under the Tenth Amendment.

11        However, the issue is not whether a federal court may eliminate the legislature's ability to

12  decline to ratify a Compact.  This is not a scenario where the legislature has voted not to ratify a

13  Compact, thus prompting a lawsuit. The issue is whether inaction by the legislature can support a

14  finding of bad faith negotiation under the IGRA.  Neither party has cited authority specific to the

15  IGRA context, discussing whether inaction may support bad faith negotiation.  However, the

16  Court agrees that the minimal activity undertaken by the legislature supports a finding of bad faith

17  negotiation in violation of the IGRA.  The thrust of Defendant's argument on this point is

18  analogous to its argument under the Tenth Amendment: that the legislature is not subject to

19  IGRA's negotiation mandate.  Defendant's argument is unavailing.  As this Court has stated in

20  relation to Defendant's Tenth Amendment argument, *supra*, the ultimate mandate for the state

21  under the IGRA is not to compel negotiation.  If the state refuses to negotiate, gaming conditions

22  will ultimately be determined by the Secretary of the Interior.

23        Second, Plaintiff argues that the delay by the legislature in taking up the Compact for a

24  vote constitutes a lack of good faith.  *See e.g. NLRB v. Nat'l Shoes*, 208 F.2d 688, 692 (2d Cir.

25  1953).  Plaintiff argues that the IGRA's remedial provision codifies this principle, by requiring

26  specifically that a State engage in good-faith negotiations within 180 days, or be subject to suit.

27  25 U.S.C. § 2710(d)(7)(B); *Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024, 1033

28  (2d Cir. 1990) ("T]he manifest purpose of [§ 2710(d)(7)(B)] is to move negotiations toward a

resolution where a state either fails to negotiate, or fails to negotiate in good faith, for 180 days after a tribal request to negotiate").

Defendant responds that there is no basis for importing a labor negotiation timeline into the IGRA.  The IGRA's 180 day period is not a deadline, but a waiting period that must pass before Plaintiff may sue.  The Ninth Circuit has held that delay in the negotiating process, by itself, does not necessarily indicate bad faith. *See In re Indian Gaming Related Cases*, 331 F.3d at 1109–10 (finding seven years of Tribal-State negotiations did not indicate bad faith).  Defendant reiterates that Plaintiff does not allege delay in the negotiation process itself, which the governor engaged in, but delay in ratification by the legislature, which Defendant argues is not actionable under the IGRA.

However, in *In re Indian Gaming Related Cases*, most of the negotiation at issue occurred in the 1990s, before California had even enacted its current statute permitting certain class III gaming only on Indian lands.  At the time the amended complaint was filed by plaintiff in the district court, seeking redress under the IGRA, the state remained willing to meet with plaintiff for further discussions.  *Id*. at 1110.  The Ninth Circuit also stated plaintiff's main objections in that case were not to the "timing and procedure" of the negotiations, but to substantive provisions in the gaming compact.  *Id.* at 1110.

The difference in this case is that the parties have not presented any dispute over substantive provisions in the Compact.  Plaintiff's argument is that the legislature has not considered the Compact or presented any concerns with its provisions.  Legislative counsel points out that there is no internal rule compelling the houses to ratify a compact within a certain period of time, and some bills are reintroduced from one legislative session to another.  Further, under the plain terms of the IGRA, the 180 day period is not a deadline for the conclusion of compact negotiations; it is a minimum period after which Plaintiff may bring suit.  25 U.S.C. § 2710(d)(7)(B).  However, Defendant does not cite to any authority holding that the legislature may sit on a compact indefinitely, with the possibility of taking the compact up for a vote at an undetermined point, and thereby make the state immune from the IGRA's period for permitting suit after 180 days.  The nearly two-year period of inaction by the legislature before the Compact

1    expired, and no additional activity since then, supports a finding of IGRA bad faith negotiation.

2         Third, Plaintiff argues that if the legislature has legitimate concerns regarding the

3 Compact, it must articulate those concerns so that the parties may seek redress through further

4 negotiation.  *See e.g. Nat'l Mgmt. Consultants, Inc.* 313 NLRB 405, 408 (1993) (finding that

5 company had failed to negotiate in good faith where it "offered no reasons, offered no

6 counterproposals, and made no attempt to schedule any meetings to discuss the matter" with the

7 union).

8         Defendant responds that the legislature's ability to make counterproposals is not stated in

9 the California Constitution Article IV, section 19(f), which speaks only of ratification.  Further,

10 there is no basis to import NLRA requirements regarding counterproposals into the IGRA.

11         As an initial matter, Plaintiff's position that the legislature can do more than passively

12 review and vote on a compact has some support.  For instance, as discussed immediately below,

13 Plaintiff submits that the legislature formed a working group at some point in 2013 to study the

14 effects of casinos on non-reservation lands, and requested that the governor refrain from

15 submitting compacts relative to such casinos for ratification.  Regardless, this Court makes no

16 finding here regarding what specific action the legislature must take with respect to a compact.

17 The Court agrees with Defendant that Plaintiff has presented no authority holding that a state

18 legislature is required to submit counterproposals in order to further negotiations.  The remedy,

19 upon a finding of bad faith, is not to compel ratification by the legislature, or to compel any

20 specific activity relative to concluding a compact.  Defendant, including the legislature, may

21 continue to take no action over a compact.  If so, the IGRA provides for a mediator-selected

22 compact.  If Defendant also rejects that result, then authority is transferred to the Secretary of the

23 Interior.  25 U.S.C. § 2710(d)(7)(B)(iii)–(vii).  If the legislature desires such a result, then it is

24 well on its way to achieving such a result with its inaction in the instant matter.

25         Ultimately, it is Defendant's burden to show it has negotiated in good faith. [14]  25 U.S.C. §

---

26   [14]     In considering whether good faith is present, the Court "may take into account the public interest, public

27 safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities," and "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith."  25 U.S.C. § 2710(d)(7)(B)(iii).  The Court has considered these provisions,

28 but neither party has argued there are specific issues relative to these provisions that should dictate the Court's ruling.

1    2710(d)(7)B)(ii).  Defendant has presented no evidence of negotiation conducted after

2    transmission of the Compact to the legislature, and agrees that the legislature has conducted little

3    to no activity relative to the Compact.  Plaintiff has presented evidence that in 2013, California

4    Senator Leòn wrote to the governor voicing the legislature's concerns over non-reservation

5    casinos, and that he was creating a working group to consider casinos on non-reservation lands.

6    (ECF No. 1-2, Ex. G.)  Senator Leòn requested that the governor not submit such gaming

7    compacts to the legislature for ratification, until the working group had "completed its ratification

8    and California ha[d] adopted a clear and coherent policy on off-reservation gaming."  (ECF No.

9    1-2, Ex. G at 277.)  Defendant has failed to address Senator Leòn's letter to the governor in these

10   filings.  Considering the letter relative to when the signed Compact was sent to the legislature, the

11   Court is led to believe that the legislature was not interested in taking action on such compacts,

12   which is relevant to whether Defendant has negotiated in good faith.  However, Defendant has not

13   offered any information on the result of the working group referenced in Senator Leòn's letter.

14   The Court is aware that the legislature was concerned with non-reservation casinos and/or created

15   a group to study it, only because Plaintiff raised the issue and filed documentation with the Court.

16   Defendant relies only upon its legal argument that the legislature is not subject to the IGRA's

17   good faith mandate, which the Court finds is not supported.  For the foregoing reasons, the Court

18   finds Defendant has not met its burden of showing it has negotiated in good faith in order to

19   conclude a compact.

20       **V.  Conclusion**

21       For the foregoing reasons, Plaintiff's motion for a judgment on the pleadings is

22   GRANTED, and Defendant's motion for judgment on the pleadings is DENIED.  Defendant and

23   Plaintiff are ordered to proceed pursuant to the remedial process set forth in the IGRA, 25 U.S.C.

24   § 2710(d)(7)(B)(iii)–(vii).  As the immediate remedy, Defendant and Plaintiff are ordered to

25   conclude a gaming compact within 60 days.  § 2710(d)(7)(B)(iii).

26

27   Dated: February 16, 2016

28

                                                Troy L. Nunley
                                                United States District Judge